THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN A. YUKNIS, Defendant-Appellant.

First District (2nd Division)   No. 78-1181

Opinion filed December 4, 1979.

Leo T. McGonigal and Charles Locker, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James Veldman, and Bruce Brandwein, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Following a jury trial, defendant, John Yuknis, was convicted of attempted armed robbery and aggravated battery and was sentenced to a term in the penitentiary of from two to six years. On appeal, defendant contends that the trial court's ruling excluding evidence and limiting cross-examination concerning drugs found outside the victim's home was improper and deprived him of the opportunity to show substantial

likelihood of misidentification. Further, defendant claims that the assistant State's Attorney's closing argument unfairly represented to the jury that the excluded evidence of drugs did not exist. Defendant also raises for review other aspects of the closing argument, in which he claims the State presented material not contained in the record and thereby precluded him from receiving a fair trial. His final challenge is to the identification testimony, which he asserts was so self-contradictory that it failed to prove him guilty beyond a reasonable doubt.

On September 29, 1973, at 11:30 p.m., Joseph Barton was seriously wounded by a shotgun blast fired by one of two home invaders. Keith Carnes, Kort Emerson, Peggy Gleitsman and Andrew Joseph were also in the apartment at the time of the shooting. The victim's wife, Diane, had left for work earlier in the day.

According to the prosecution witnesses, Barton and his guests were listening to music and drinking beer and other alcoholic beverages in the living room of the basement level apartment. At about 11:30 p.m., the doorbell in the kitchen rang and Barton left the living room, accompanied by Gleitsman, to see who was at the door. Gleitsman went into the bathroom while Barton continued to the back kitchen door. The kitchen and porch lights were on and when Barton looked out the back window, he recognized a man named John, who had been in his apartment with a mutual friend two days earlier and who was later identified as defendant. As Barton opened the back door, defendant pulled a gun and demanded that he be let in. Another man, wearing a ski mask and carrying a double-barrel sawed-off shotgun, emerged from the shadows and followed defendant into the apartment. Neither the victim nor the other witnesses were able to identify the man in the ski mask.

The masked intruder pointed the shotgun at Barton and ordered him to go into the bedroom while defendant went down the hallway to the living room. As he entered the living room, the defendant told Carnes, Joseph and Emerson to hit the floor; when one said "what," defendant fired the pistol into the couch. The three were directed to crawl into the kitchen and to keep their heads down.

At the same time, in the bedroom, the masked intruder was demanding that Barton turn over his money, drugs, or anything else of value and was looking into a few of the dresser drawers. Barton responded that he did not keep money in the house and did not have any drugs. Immediately after the sound of a gunshot came from the area of the living room, the intruder ordered Barton into the kitchen where his friends were lying face down on the floor. The demand for money or drugs was repeated and, once again, was denied. As Barton gave this response his hands raised slightly, and the masked intruder fired the shotgun. The blast hit Barton almost point blank; both intruders fled the

apartment. As remembered by the witnesses, the above events happened within three or four minutes.

When the police arrived, Barton was sitting in a chair, doubled over in extreme pain. The other witnesses were excited and in Gleitsman's case, hysterical. Officers Smith and Trotter took Barton to the hospital, then returned to the apartment to continue the investigation. Officer Smith testified that he saw about 10 beer cans, but no drugs. In his opinion, the witnesses appeared excited but not under the influence of any intoxicant. The next witness, Chief Doneske, stated that he assumed control of the investigation sometime later that morning. Both defense and prosecution stipulated to Doneske's qualifications as a firearms expert. He testified that the casing from a 9-millimeter automatic hand weapon was found on the floor of the living room. Wadding from a 12-gauge shotgun was also found, but neither of the weapons used was ever recovered. Another of his officers discovered Gleitsman in a car outside the apartment building and came across a 20-gauge shotgun shell under her dashboard.

Each of the witnesses admitted that he had been drinking—Barton, two beers; Carnes, four quarts and three cans of beer; and Andrew Joseph, nine beers; but all denied that they were intoxicated.

Barton further testified that a policeman interviewed him the next day; he described the intruder and identified him as "John from Lyons." He also reiterated that Gleitsman stayed hidden in the bathroom throughout the home invasion. On cross-examination Barton was questioned about his previous meeting with defendant. He stated that defendant had come to his home with Rich Strucker, a mutual friend, and a young lady. The defense attorney asked Barton where Strucker was at the time of trial. Barton responded that Strucker had denied being in his apartment with the defendant prior to the crime.

Both Keith Carnes and the victim's wife, Diane, testified that they had seen the defendant at the Bartons' apartment that Thursday night before the home invasion. Keith Carnes admitted that although the defendant looked familiar on the night of the crime, it was three days before Carnes remembered where he had seen the defendant previously. During the home invasion, Carnes had two opportunities to view the defendant. Carnes first saw defendant as he entered the living room and later as Carnes was lying on the floor in the kitchen. Carnes, as well as Barton, made in-court identifications of defendant and commented that he was wearing clear eyeglasses during the incident. Andrew Joseph's testimony was consistent with that of the other witnesses but he could not make any identification of the intruder because he did not have an adequate opportunity to view him.

The defense called three people to the stand: Sergeant Trotter, a police officer; John Shadkowski, an alibi witness; and John Yuknis, the defendant. Sergeant Trotter wrote the police report and was the officer in charge until Chief Doneske arrived on the scene. He testified that shotgun pellets were found in the bedroom and kitchen and that wadding was discovered in the doorway of the bedroom. Blood stains in the hallway led to the entrance of the living room and through the doorway into the bedroom. He also stated that Carnes, Joseph and Gleitsman were all very intoxicated and that he could smell alcohol on their breath. On cross-examination, however, he wavered, saying that once the witnesses calmed themselves at the police station, they did not seem as disoriented and had much less trouble answering questions. Similarly, Trotter was questioned about statements in the police report attributed to Carnes and Joseph that both intruders were masked. Trotter admitted that there was quite a bit of confusion and in the midst of the excitement and hysteria, he might have been mistaken as to what the witnesses had said.

During his investigation, Trotter found a 20-gauge shotgun which had one "dirty" barrel. But he qualified his conclusion that the gun had been fired by specifying that it could have been discharged one to two months prior to the incident. Although blood stains were found near the living room, no pellets or wadding were discovered there.

The defendant next called John Shadkowski to substantiate his alibi. Shadkowski testified that he, defendant, and two other friends played cards the night of the incident. Following the card game, they went to various bars. He was, therefore, with defendant continuously into the early morning hours.

The final witness was defendant himself. He gave substantially the same alibi testimony as was given by Shadkowski but went on to detail his movements following that evening. After the card game and later activities, defendant went to his brother's home for the night rather than his own. Defendant explained that he had left the apartment a mess and he was afraid his wife would be angry. He felt that if he went to his brother's, she would have time to "cool off." At his brother's, defendant learned of the charges against him and fled into Chicago, staying in a series of hotels until he could raise money for bond. After two months, he surrendered himself to the police.

Defendant denied ever being in Barton's home. He said that his only meeting with Barton was in a forest preserve several months before the incident. Defendant found out that Barton was trying to sell drugs and made him leave the preserve. Barton was called in rebuttal and testified that he had not been in the forest preserve and had not argued with defendant. After all the testimony was taken, the State entered

defendant's prior conviction for theft into the record. The jury found defendant guilty of attempted armed robbery and aggravated battery. This appeal followed.

During the course of the trial, the State made a motion *in limine* requesting the court to direct the defense to refrain from any further cross-examination dealing with the narcotics that were found in the gangway outside Barton's apartment. The defense objected, arguing that the initial police report had described the occupants of the apartment as intoxicated by something other than alcohol and that the discovery of drugs near the apartment was clearly relevant to the condition of the eyewitnesses. The clear bags of narcotics, one of which appeared to contain marijuana and the other which held 12 white tablets, were behind a brick wall a few steps from the kitchen entry. Since the drugs were found behind a relatively large (20-unit) apartment building with no evidence to connect the drugs to Barton, Carnes, Joseph, Gleitsman or Emerson, the motion *in limine* was granted on the basis of lack of relevance.

Defendant contends that the motion *in limine* was improperly granted where the issue was the witnesses' ability to identify and the excluded evidence would affect that ability. As defendant indicates, no evidence was found or produced at trial connecting him with the home invasion other than the eyewitness testimony. Therefore, the credibility and accuracy of the eyewitness identifications are dispositive on the question of defendant's guilt. Defendant argues that it was essential to his attack on the identifications to show that seriously debilitating intoxicants, which would affect the judgment and perception of the users, were present at the scene.

■■ We agree that evidence of Carnes' or Barton's use of hallucinogenic drugs on the night in question might well affect the validity of their identification testimony. We also recognize that a defendant is entitled to present evidence which might tend to create a doubt concerning his guilt (*People v. Durr* (1978), 58 Ill. App. 3d 525, 374 N.E.2d 873) or to interrogate identifying witnesses on any matter which goes to explain, modify or discredit their testimony. (*People v. Morris* (1964), 30 Ill. 2d 406, 197 N.E.2d 433.) However, it is elementary that for evidence to be admissible it must be relevant and material; it must tend to make a proposition at issue either more or less probable. (*Marut v. Costello* (1966), 34 Ill. 2d 125, 128, 214 N.E.2d 768; *People v. Tate* (1978), 64 Ill. App. 3d 1, 380 N.E.2d 976.) Therefore, in order for the seized drugs to be suggestive of Carnes' or Barton's possession and use on the night of the incident, there must be some clear evidence connecting the sacks of drugs to the two men. Other than general proximity, no direct evidence was

introduced to connect those particular sacks of drugs, found in a public gangway outside a 20-unit apartment building, to either Carnes or Barton. The police report, which defendant would present as the connecting evidence, only contains vague suggestions of possible drug intoxication by Carnes, not the lead witness, Barton. Further, it does not in any way relate the sacks of drugs to the occupants of the apartment. Thus, the evidence was too remote and uncertain to justify its admission. See, *e.g.*, *People v. Rubin* (1937), 366 Ill. 195, 7 N.E.2d 890; *People v. Mosley* (1979), 68 Ill. App. 3d 721, 386 N.E.2d 545.

The trial judge in ruling on issues of materiality and relevance as well as on scope of cross-examination has wide discretion; only where there is an abuse of that discretion will a reviewing court interfere with his decision. (*People v. Gilbert* (1957), 12 Ill. 2d 410, 147 N.E.2d 44; *People v. Matthews* (1972), 7 Ill. App. 3d 1059, 289 N.E.2d 98; *People v. Gardner* (1977), 47 Ill. App. 3d 529, 362 N.E.2d 14.) Furthermore, the motion *in limine* was made following defense cross-examination of the identification witnesses. Before the motion was made, defendant had the opportunity to question Carnes and Barton about their alleged state of intoxication, whether liquor or drug induced. The court also allowed defendant to ask Carnes if he was questioned by the police about drugs found by the back door of the apartment. Without some showing of relevance to the occupants of the apartment, any further cross-examination concerning the drugs would have been based on speculation and surmise alone.

Defendant's next two contentions relate to allegedly improper closing arguments by the prosecutor. While the comments are often not so prejudicial as to mandate reversal, this reoccurring problem of "brinkmanship" in the propriety of remarks made by prosecutors warrants concern. See *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200; *People v. Baker* (1979), 78 Ill. App. 3d 411, 396 N.E.2d 1174; *People v. Price* (1979), 76 Ill. App. 3d 613, 394 N.E.2d 1256; *cf. Thorsen v. City of Chicago* (1979), 74 Ill. App. 3d 98, 392 N.E.2d 716.

■■■ However, in the instant case not only did defendant fail to object to the comments at the time of trial, but also in each instance, the remarks of which he complains were at least arguably in response to his own closing argument. When defense counsel alleged coverup, frame-up, and conspiracy with veiled references to grants of immunity and personal vendettas of the eyewitnesses, he must have expected the prosecutor to respond. After defense counsel suggested repeatedly that drugs were an issue in the case, even though there was no relevant evidence to substantiate this contention, the prosecutor made the following remark in his rebuttal:

"And counsel says, well, these people were all spaced out. They were drinking this or taking that. Well, what evidence is there of that ladies and gentlemen. * * * Is it possible to have drugs all over the place and have the police come in 2 or 3 minutes later and find nothing in the apartment?"

This remark does not seem excessive in light of the inviting comments made by defense counsel. We also note that an objection was tendered to this statement but not to the part that was challenged on appeal. Defense counsel objected to the time (2 or 3 minutes) rather than the ambiguous reference to excluded evidence. The general rule is that failure to object to comments waives the right to raise the point on appeal. (*People v. Donald* (1963), 29 Ill. 2d 283, 194 N.E.2d 227; *People v. Smith* (1962), 25 Ill. 2d 219, 184 N.E.2d 841.) The second remark complained of, in which the State's Attorney stated that the witnesses had looked at pictures to identify Yuknis, was error. Defendant properly objected and the court sustained the objection, directing the jurors to disregard the comment. The trial court's prompt action has usually been viewed as sufficient to cure any prejudice. (*E.g., People v. Hampton* (1969), 44 Ill. 2d 41, 45-46, 253 N.E.2d 385.) We do not approve of the marginally improper comments made by the prosecutor here; however, the rule is that reversal is not warranted unless the remarks influenced the jury in a manner that resulted in substantial prejudice to the accused. (*People v. Stahl* (1962), 26 Ill. 2d 403, 406, 186 N.E.2d 349.) Where, as here, there was positive identification testimony by two eyewitnesses, we cannot find that it is at all likely that the remarks made were a material factor in the conviction. (*People v. Clark* (1972), 52 Ill. 2d 374, 390, 288 N.E.2d 363.) Further, after a thorough review of the entire argument, we find that the comments complained of were either within the range of permissible inference, invited by the defense argument or the subject of an objection which was sustained. (*People v. Baptist* (1979), 76 Ill. 2d 19, 30, 389 N.E.2d 1200.) All of these circumstances have been held to negate the impact of an otherwise improper remark. See *People v. Weisberg* (1947), 396 Ill. 412, 71 N.E.2d 671, *cert. denied* (1947), 331 U.S. 826, 91 L. Ed. 1870, 67 S. Ct. 1353; *People v. Farmer* (1963), 28 Ill. 2d 521, 192 N.E.2d 916; *People v. Swimley* (1978), 57 Ill. App. 3d 116, 129, 372 N.E.2d 887, *cert. denied* (1978), 439 U.S. 911, 58 L. Ed. 2d 257, 99 S. Ct.

■ Defendant's final contention, that the identification testimony was so self-contradictory as to be insufficient to establish guilt beyond a reasonable doubt, is also unsupported by the record. It is well established that the testimony of a single witness who had ample opportunity to form a positive identification is sufficient to convict, even though such testimony is contradicted by the accused. (*E.g., People v. Stringer* (1972),

52 Ill. 2d 564, 569, 289 N.E.2d 631.) Any inconsistencies in testimony do not negate its import but rather go to the weight the trier of fact gives to the testimony. (*People v. Henderson* (1976), 36 Ill. App. 3d 355, 367, 344 N.E.2d 239.) Defendant had a chance to point out the inconsistencies between Carnes' police report description of two masked men and the trial testimony of only one masked intruder. On cross-examination the State allowed the police witness to explain the seeming inconsistencies. The trier of fact, in this case the jury, determines the credibility of the witnesses and the weight to be given their testimony. (*E.g., People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 327, 379 N.E.2d 847.) Carnes' trial testimony was corroborated in all material details by Joseph and Barton. Although Joseph was unable to make an identification of defendant, he did substantiate the description of the home invasion.

■■ ■ Barton's testimony was undeniedly the most damaging. It was positive and credible. Defendant attempted to show bias for the testimony, but his story strains credulity. He alleges that based upon a brief argument several months before, an encounter that Barton denies occurred, Barton and Carnes would conspire to "frame" defendant for aggravated battery and attempted armed robbery. The jury has the right to consider the probability or improbability of the testimony in weighing the evidence. (*People v. Holtz* (1974), 19 Ill. App. 3d 781, 790, 313 N.E.2d 234.) Similarly, whether the witnesses' alibi testimony created a reasonable doubt was a matter for the jury. (*People v. Berland* (1978), 74 Ill. 2d 286, 307, 385 N.E.2d 649, U.S. appeal pending, No. 78-1744; *People v. Setzke* (1961), 22 Ill. 2d 582, 177 N.E.2d 168.) The jury here chose to believe the identification testimony and to reject the defense theory of frame-up and conspiracy. A reviewing court will not set aside a verdict of guilty unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 227, 367 N.E.2d 666.) Accordingly, we find that there was sufficient credible evidence to support the jury's verdict and defendant's conviction is thereby affirmed.

Affirmed.

PERLIN and HARTMAN, JJ., concur.