THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS BERNARD JACKSON, Defendant-Appellant.

Fourth District   No. 4—84—0274

Opinion filed February 7, 1985.—Rehearing denied March 8, 1985.

Daniel D. Yuhas and John J. Hanlon, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Robert J. Biderman, of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLS delivered the opinion of the court:

Conviction: residential burglary.

Sentence: maximum term of 15 years.

We affirm.

Since Jackson argues he was not proved guilty beyond a reasonable doubt, a fairly detailed recitation of the evidentiary facts is required.

### I. THE FACTS

Carol Madison testified at trial that she was the victim of a home

burglary. She and her two young children lived in a home at 302 West Vermont in Urbana. On the west side of the home there is a fence approximately five feet tall which extends along the length of her yard as far as the front sidewalk. Also to the west of the house is a large lot with several trees. Carle Drive abuts the lot to the west. Across Carle Drive is the residence of Mrs. Bland Pelmore, Madison's nearest neighbor to the west.

Madison left her home on August 29, 1983, at approximately 7:45 a.m. She locked the front and back doors behind her. She left her two children behind, but they left for school at approximately 7:55 a.m. Madison returned home at approximately 5:30 p.m. that evening and discovered that her television and microwave oven were gone. Both had been in the house that morning. She discovered that an exterior bathroom window screen had been slit open, and the back door to the house left ajar. The interior bathroom window had been raised when Madison left for work. She testified that she had given no one permission to enter the house or remove anything from it.

Two days before the crime, two black males who claimed to be Jehovah's Witnesses came to Madison's home. They approached her house on foot. By the time she got to the door of her house, the two men were in the process of leaving. They were at a distance such that she could not judge their height or weight. One of the men, however, noticed that Madison had opened the door and asked her if she would be interested in purchasing some literature from the Jehovah's Witnesses. She declined the offer, and the two men then left the area.

Mrs. Bland Pelmore, Madison's nearest neighbor to the west, testified at trial. She estimated that the two houses were approximately 200 feet apart. On August 29, 1983, she was home, talking on the phone to her husband. She observed a black male going toward the back of the victim's home. She noticed that he was wearing an orange cap. She also noticed that the man was approximately a head taller than the fence between the homes, which she believed to be about five feet high.

Pelmore noticed a car leaving Madison's home about five minutes later. She had noticed the car backed up in the driveway, with the front of the car facing Vermont Street at the front of Madison's home. The car proceeded west on Vermont Street. She described the car as an older make, large, medium blue vehicle. The last three digits of the license plate were 137. During her testimony, Pelmore stated that she was nearsighted, and that she did not have her glasses on during this time. She further testified that while she could see the front half of Madison's home and the driveway, she could not see all

the way to the ground because of the fence between their houses and she could see no part of the back yard or garage. She further testified that the lot separating her home from Madison's bore several large trees which still bore leaves on August 29, 1983.

She testified additionally that the Jehovah's Witnesses who Madison claimed had visited her home had not visited the Pelmore residence, nor did she ever observe two black males visiting Madison's home two days prior to the theft. Finally, she did not recall telling Madison that she, Pelmore, had observed the two Jehovah's Witnesses approach the Madison house or get out of a large blue car that was parked on Carle Drive. She stated that she did not recall Madison having told her about the two black males coming to Madison's home.

Dean Carmien testified that on August 29, 1983, he was working on the exterior of a house at 208 West Vermont in Urbana. The house was approximately one-half block east of the Madison home. He testified that around 11:30 a.m. he observed a car described as a large, dark blue, middle or late 1970's Buick or Lincoln Continental "cruising" Vermont Street. Carmien identified People's exhibit No. 11 as being a photograph of a car that looked like the car which he had seen on that day. People's exhibit No. 11 was a picture of defendant's car. He testified that he could not positively identify the vehicle as being the same car as he saw on August 29. Carmien finally testified that the car which he had observed contained two black males, neither of whom he could identify if he saw them again.

University of Illinois police department investigator Samuel Jordan testified that on August 29, 1983, he was called to 302 West Vermont in Urbana to investigate an apparent burglary. As part of the investigation, he lifted some latent fingerprints from the exterior screen of the bathroom window area of Madison's home. The prints were on the inside sill of a screen that had been cut and appeared, to the investigator, to be facing downward toward the floor. No fingerprints were recovered from the outside of the window.

Jordan testified that he made a total of three lifts of fingerprints from the bathroom window, and placed each lift on its own card. He identified People's exhibits Nos. 10A, 10B, and 10C as being the lift cards. He further testified that he checked many other areas of the Madison home for fingerprints but found none.

Jordan sent the latent fingerprints to the FBI laboratory in Washington, D.C., on November 10, 1983. He later received information from a police officer that the defendant herein had committed crimes of a similar nature in Urbana. Based on this information, he requested an FBI comparison of the latent prints he had removed from

the Madison home with known prints of Thomas Bernard Jackson. He was advised that the prints matched, and, based on this information, went to defendant's residence to arrest him. While at Jackson's Urbana residence, Jordan saw, in Jackson's driveway, a large, dark blue, older Lincoln Continental bearing license plate CPS 137. He identified People's exhibit No. 11 as a photo of the car he had seen there. Jordan identified Jackson as the man whom he arrested on January 6, 1984. Following his arrest, Jackson was fingerprinted and the new prints sent to the FBI.

Whitley Brown, an FBI supervisory fingerprint specialist, testified that on February 16, 1984, he compared People's exhibit No. 12, the inked fingerprints taken after Jackson's arrest, with People's exhibit No. 10, the latent prints which had been obtained by Investigator Jordan at the Madison home. Defendant's attorney objected to this line of testimony, but the objection was overruled, after which defendant noted a continuing objection to testimony concerning the fingerprints. Agent Brown's opinion was that five of the latent fingerprints found at the Madison home were defendant's.

Agent Brown stated that he had at no time made a written report concerning the comparison and that his in-court testimony regarding the comparison was from his memory only. He further testified that he had appeared in court 43 times previously for the purpose of giving expert testimony. Brown finally testified that while fingerprints could be transferred from one location to another, doing so was difficult and unlikely. At this point, the State rested its case in chief.

Defendant's case consisted of the testimony of the victim of the theft and the wife of the defendant. Carol Madison testified that she had had a conversation with Mrs. Bland Pelmore concerning the Jehovah's Witnesses who had come to Madison's home. She said that she and Pelmore had provided information to each other about this matter and agreed that Pelmore had, during the conversation, told her that she had observed a family exit a dark blue vehicle that was parked on Carle Drive. Madison added that this conversation was somewhat confused and occurred during a time while she was still upset about the burglary of her home.

Teresa Jackson, defendant's wife, testified that on August 15, 1983, she and her husband were involved in an automobile accident which resulted in the right rear quarter panel of their car being hit and "demolished." The damage had not been repaired by August 29, 1983. She testified that in the accident the defendant had received several injuries, resulting in a weak, sore back which caused him to be stiff and bedridden. According to Jackson, her husband could not lift

anything or bend over as late as August 29, 1983. She identified People's exhibit No. 11 as a picture of her husband's car. While she did not know what the license plate number of the car was, she did know that there were three sets of keys to the car, one of which she possessed, one of which her husband possessed, and one of which had been lost.

The final piece of evidence admitted was People's exhibit No. 14, which was a certificate from the Illinois Secretary of State's office showing license plate No. CPS 137 being registered to defendant. Following deliberations, the jury returned a verdict of guilty of residential burglary.

A hearing on defendant's post-trial motion and sentencing was had April 9, 1984. Prior to commencement of the hearing, the court announced that it had received a letter written and signed by defendant. The letter was not included in the record before this court. Its contents are reflected in a colloquy which was transcribed as follows:

"THE COURT: *** The record should show that I have received a letter dated April 9, 1984, handed to me by Mr. VanDenBussche, and signed by Mr. Jackson. That I have just now shown to Miss Frooman, and she has read it as well, and it appears that in this letter Mr. Jackson is complaining of his lawyer, who he says didn't represent him properly, because a witness that Mr. Jackson requested wasn't called to testify. Is that the gist of your position, Mr. Jackson?

MR. JACKSON: Yes, sir.

THE COURT: Mr. VanDenBussche, since your client has now raised this point, I think it something that would be appropriate for you to speak to.

MR. VanDenBUSSCHE: Your Honor, I spoke to Dr. Kosack and to Cathy Praul, Dr. Kosack's secretary and business manager. Both Dr. Kosack and Miss Praul informed me that their records indicated that Mr. Jackson was, in fact, there on that day [August 29, 1983], but that his appointments in the afternoon [sic], and that their records are not specific enough to tell exactly when he was at their office. It could have been 2:00. It could have been 1:00. It could have been 12:30. It could have been afterwards. That there was no specifics as to exactly when. I also spoke to Dr. Kosack regarding the injuries, and Dr. Kosack, in my opinion, could not have provided any more information than was provided regarding Mr. Jackson's defense.

THE COURT: There was testimony concerning his having

been injured?

MR. VanDenBUSSCHE: Yes, there was.

THE COURT: So, essentially, this was your tactical judgment on a matter which you had investigated?

MR. VanDenBUSSCHE: Yes, Your Honor."

After a further brief colloquy, the court asked the defendant if he could supply the name of a particular attorney whom he desired to hire. The defendant, after consulting with friends in the courtroom, told the court that there was no specific person whom he wished to hire. The court then denied defendant's post-trial motion.

A sentencing hearing was had, after which defendant was sentenced to the statutory maximum of 15 years for residential burglary.

Defendant raises two points which would require the reversal of his conviction and one which would require a new hearing on his post-trial motion and sentencing. We affirm *in toto*.

## II. REASONABLE DOUBT

█ Defendant first argues that under *People v. Hister* (1975), 60 Ill. 2d 567, 328 N.E.2d 531, and *People v. Coulson* (1958), 13 Ill. 2d 290, 149 N.E.2d 96, his convictions must be overturned because one State's witness, Mrs. Bland Pelmore, who is nearsighted, did not notice damage to defendant's car when it was parked 225 feet away, was impeached concerning events which occurred two days prior to the crime, and did not call the police even though she had observed suspicious activities at a neighbor's home. Defendant goes on to argue that her testimony was critical because she was the only witness to place defendant (by virtue of her testimony concerning the make, model, color, and partial license plate number of the car which she had observed at her neighbor's home) at the crime scene.

The State responds that inconsistencies in testimony do not negate its import, but simply go to the weight to be given to the testimony by the trier of fact. The State cites *People v. Yuknis* (1979), 79 Ill. App. 3d 243, 398 N.E.2d 258, in support of this proposition. The State goes on to argue that this witness' testimony could not possibly be viewed as critical, since defendant's unexplained fingerprints were found at the crime scene and this factor alone is sufficient to support the defendant's adjudication of guilt beyond a reasonable doubt. See *People v. Rhodes* (1981), 85 Ill. 2d 241, 422 N.E.2d 605.

*Rhodes* controls. In *Rhodes*, the victim left a home which bore no broken windows. Upon his return, a window was broken, and, following a subsequent investigation, defendant's fingerprint was found on a glass fragment. The victim testified that he did not know the

defendant, that defendant had never been to the victim's home, and that he had never given permission to anyone to enter the home or remove any of its contents. Under these circumstances, the supreme court upheld the defendant's conviction despite no other evidence being adduced.

Turning to the case *sub judice*, even if Pelmore's testimony was so contradictory and improbable that its probative value was zero, the conviction must still be upheld based on the unexplained fingerprints of the defendant which were found at the scene of the crime.

### III. DISCOVERY

■■ ■ The defendant argues the State violated the trial court's discovery order, the violation resulted in prejudice, and his conviction must be overturned.

Prior to trial, defendant moved for discovery under Supreme Court Rules 412(a)(iv) and (a)(v) (87 Ill. 2d Rules 412(a)(iv), (a)(v)). The motion was granted and an order entered which stated:

> "It is hereby ordered that the State pursuant to Supreme Court Rule 412 shall disclose to defense counsel for the above named Defendant the following material and information within its possession and control:
>
> * * *
>
> 4. Any reports or statements of experts, made in connection with this case, including results of scientific or mental examinations and of scientific tests, experiments, or comparisons. Oral reports or statements of experts shall be reduced to writing by said experts."

On August 29, 1983, investigator Samuel Jordan lifted several latent fingerprints from the bathroom window area of the victim's home. As the police investigation continued, defendant was suggested to Investigator Jordan as a possible suspect, based on the fact that he had been previously involved with crimes involving a similar *modus operandi*. Based on this information, Jordan wrote to the FBI asking them to compare the prints which he had lifted from the home with those on file with the FBI for Thomas Bernard Jackson. The request to compare the lifted prints with the file prints was included in the discovery materials which were, pursuant to the trial court's order, provided to the defense in February 1984.

On December 7, 1983, the FBI reported, in a letter to Jordan, that some of the latent prints removed from Madison's home matched those on file with the FBI for Thomas Bernard Jackson. The letter requested that a "current set of fingerprints" of defendant be sent to

the FBI "in the event latent print testimony is desired." This letter was also included in discovery materials provided to the defense in February 1984.

Jackson was arrested on January 6, 1984. He was fingerprinted, and the prints were mailed to the FBI in accordance with the FBI's earlier request. The inked fingerprints taken January 6, 1984, were introduced at trial as People's exhibit No. 12. A police report, which indicated that this set of inked prints was taken but which did not indicate that they were mailed to the FBI, was also made available to the defense through discovery in February 1984.

Whitley Brown, a fingerprint expert, testified at defendant's trial that on February 16, 1984, he compared People's exhibits Nos. 10A, 10B, and 10C (the latent prints) and People's exhibit No. 12 (defendant's January 6, 1984, inked prints). He told the jury that this comparison was positive as to five fingerprints. He also testified that he made no written report of this comparison, and was testifying from memory regarding it. Brown used as demonstrative evidence People's exhibit No. 13, which was an enlargement of one of the latent prints and one of the inked prints.

From these facts, the defendant argues that the failure of the State's Attorney to insist that the FBI expert witness reduce his fingerprint comparison to writing violated the trial court's discovery order which required that "oral reports or statements of experts shall be reduced to writing by said experts." Defendant proceeds to argue that such a conclusion is required by the policy of preventing parties to a lawsuit from avoiding discovery by conducting experiments or comparisons and not reducing them to writing, citing the case of *People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40. Defendant then urges that the error was clearly harmful, since the fingerprints tied defendant to the crime scene and the prints taken from the defendant following his arrest were the only properly admissible evidence under this court's decision in *People v. Miller* (1974), 20 Ill. App. 3d 1061, 313 N.E.2d 660. Defendant concludes that the information was additionally harmful because, had it been known to the defendant and his counsel, it might have been useful in determining whether to seek a negotiated plea instead of going to trial.

The State responds *first* that *Nichols* is distinguishable as a due process case which, by definition, must involve the suppression of favorable evidence following a request for its production, and *second*, that the defendant was neither surprised nor prejudiced by the State's action as reflected by his trial attorney's admission that he "[could not] tell the court I would have done any differently" even if

he had been told his client's fingerprints matched the latent prints lifted from the crime scene. The State also argues that the negotiated plea argument raised by defendant is without merit, since the defendant could have taken a continuance after the expert's testimony to take advantage of possible plea negotiations but did not do so, and further that it was within the defendant's personal knowledge at all times whether the original file prints held by the FBI were his or not.

Noting that *Nichols* is properly distinguished as a due process case dealing solely with the nondisclosure of evidence favorable to an accused, our opinion is that this issue is controlled by the general rule that even where the State has arguably failed to comply with discovery prior to trial, it is nevertheless within the sound discretion of a trial court to admit the undisclosed testimony or evidence, and that the admission of such evidence does not constitute reversible error absent a showing by the defendant of resulting surprise and prejudice. See *People v. Mason* (1978), 61 Ill. App. 3d 918, 378 N.E.2d 384; see also *People v. Wells* (1982), 106 Ill. App. 3d 1077, 436 N.E.2d 688.

Here, the defendant utterly failed to show that he was surprised by the fact that the prints which were taken from him after his arrest and the prints which the FBI had on file and had previously told the State belonged to the defendant were identical. Further, the defendant was, through the discovery materials provided to him, fully apprised of the fact that the FBI had indicated the presence of a match between the prints which were on file and the prints which were lifted from the victim's home. Additionally, he knew he had been fingerprinted following his arrest. Under these circumstances, the defendant's allegations of surprise are simply unavailing, and therefore the admission of the evidence at trial was not reversible error.

Additionally, defendant's argument that the State had a general duty to reduce the FBI expert's findings to writing is negated by *People v. Caldwell* (1976), 39 Ill. App. 3d 1, 349 N.E.2d 462, where the court held that there is no general requirement that all oral statements in possession or control of the State be reduced to writing absent a showing of bad faith on the part of the State. Here, there was no showing of bad faith.

In conclusion, and to prevail on this point, defendant must show resultant prejudice and surprise. He has not done so, and therefore the argument must fail.

### IV. POST-TRIAL HEARING

As previously indicated, Jackson and his attorney appeared before the trial court for the dual purposes of hearing defendant's

post-trial motion and holding a sentencing hearing. Before convening those matters, the court announced that it had received a letter from Jackson in which he complained that he had been ineffectively represented by his trial attorney. The letter apparently complained that a witness had not been called to testify. Jackson verbally detailed his complaint by indicating to the court that the witness had not been called although he and his office staff had been interviewed. Trial counsel stated that the witness had not been called because he could not place defendant at the witness' place of business at any relevant time and that his testimony concerning defendant's injuries would have been cumulative to that given by defendant's wife. The court indicated that it might delay the post-trial motion and sentencing hearing if Jackson could give the court the name of a lawyer Jackson was prepared to hire. Jackson could not name an attorney, and the trial court denied the post-trial motion and allowed defendant's attorney to continue representing him for sentencing. Jackson was sentenced to the maximum term of 15 years' imprisonment.

Defendant argues on appeal that where a defendant, in a post-trial motion, alleges the ineffective assistance of trial counsel, new counsel generally should be appointed for the purpose of conducting the hearing. For this proposition he cites *People v. Fields* (1980), 88 Ill. App. 3d 821, 410 N.E.2d 1178. The reason for appointment of new counsel is that the original trial attorney would generally be under a conflict of interest were he called upon to justify his actions in the case. In defendant's view, this is exactly what happened in the case *sub judice* in that his trial attorney was forced to take an adversarial position against his client in arguing to the court that his failure to call an alibi witness was justified.

The defendant agrees that this is not a *per se* rule (see *People v. Johnson* (1981), 98 Ill. App. 3d 228, 424 N.E.2d 610) but argues that the rule is properly invoked if the underlying circumstances of the ineffective assistance claim arguably support it. In defendant's view of things, his treating physician should have been called either as an alibi witness or as a medical expert who could have opined that defendant was physically unable to pick up a television or microwave oven on the day of the crime.

Defendant finally argues that in *People v. Krankel* (1984), 102 Ill. 2d 181, 464 N.E.2d 1045, the supreme court remanded for a new post-trial hearing a case wherein a defendant alleged his trial attorney's failure to investigate an alibi witness. To defendant's view, this should be read as recognizing as meritorious most claims revolving around the failure of an attorney to call an alibi witness and calls for

remanding this case for a new post-trial hearing with defendant being represented by a new attorney.

The State responds that *Johnson* must not be read as calling for appointment of new counsel any time a trial attorney is called upon to explain matters alleged by a client as showing incompetency, but as calling upon a trial court to determine whether the facts underlying defendant's claim have potential merit and to refuse to appoint new counsel if defendant's claim is spurious or revolves simply around a matter of trial strategy or tactics. The State concludes that the facts here show the decision not to call the defendant's doctor was a matter of trial tactics since the doctor could admittedly not place the defendant in his office at the time of the crime and the defendant's wife had previously testified pertaining to defendant's injuries.

We are in general agreement with the State's position on this issue, with one exception which will be discussed. In our opinion, the problems created by a defendant who, during post-trial proceedings, claims that his attorney has ineffectively represented him during trial, are best met by the objective tests set forth in *Johnson*. The trial court should examine the factual matters underlying the defendant's claim. There are several matters to be determined. If the claim goes to matters of trial tactics or strategy, the defendant's claim should be found spurious and his request for new counsel denied. This was the case in *Johnson*. If, however, the factual matters show possible neglect of the defendant's case, the court should appoint new counsel who can undertake an independent evaluation of the defendant's claim and present the matter to the court from a detached, yet adversarial, position. This was the case in *Krankel*, where defendant alleged that his attorney failed to interview an alibi witness.

It seems elementary that during the evaluation of defendant's claims, some interchange between the court and the defendant's attorney must take place. Such an interchange is necessary to avoid potential abuses by those who would falsely claim situations of the *Krankel* type. It is simply stretching matters beyond credulity to claim that in responding to the court's inquiries a defendant's attorney has somehow taken a position adverse to his client's best interest. This is not to say that defense counsel should be able to undertake lengthy legal arguments pertaining to the fact that his representation as performed conformed to limits of proper advocacy as delineated by case law. Rather, counsel may simply answer questions and explain the facts and circumstances surrounding matters which are alleged by his client to demonstrate that he was not adequately represented at trial.

Turning to the case at bench, we find that defendant's attorney, upon questioning by the trial court, simply explained that he did not call the defendant's doctor because he could not place defendant in his office at a specific time. We note—parenthetically—that the actual time of the perpetration of the crime was never definitely established at trial, making this testimony virtually nonprobative as an alibi. Secondly, defendant's claim that his doctor could have expressed a medical opinion concerning his inability to lift the stolen items is equally without merit. Even if such testimony was admissible, it was certainly cumulative to the evidence presented by defendant's wife. Additionally, one witness testified to having seen two black males in a car similar to defendant's, and the car cruising the neighborhood on the day of the crime. From this it could be readily inferred that defendant was operating with an accomplice, thus rendering this point moot.

We conclude that defendant's trial attorney did no more than was required in allowing the trial court to perform its duty of determining whether defendant's claim of ineffective assistance during trial was meritorious or spurious. The trial court determined the contention was spurious, a determination which was not manifestly erroneous and which we affirm.

We turn now to one final matter which we find most curious in this case. Defendant was represented throughout this case by privately retained counsel! At oral argument in this court, his appointed counsel was unable to explain under what authority a trial court might *sua sponte* dismiss an attorney with whom a defendant has entered a contract of representation. To our way of thinking, only two parties hold this power, the defendant and his attorney. Just how and why a court should be forced to reorder a contractual relationship when the defendant held the ultimate power at all times is simply beyond us. At any rate, our opinion is that both court and counsel acted appropriately in dealing with this matter, and the decision to not appoint new counsel for the defendant is affirmed.

Affirmed.

McCULLOUGH and TRAPP, JJ., concur.