THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WESLEY ROBINSON, Defendant-Appellant.

Third District   No. 3—89—0822

Opinion filed March 26, 1992.

STOUDER, J., dissenting.

Kenneth D. Brown, of State Appellate Defender's Office, of Ottawa, for
appellant.

Edward Burmila, Jr., State's Attorney, of Joliet (John X. Breslin and Judith Z. Kelly, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GORMAN delivered the opinion of the court:

The defendant, Wesley Robinson, was charged in a three-count indictment with first degree murder and armed robbery. The defendant pleaded not guilty and was tried before a jury. Pursuant to the defendant's request, an instruction regarding the offense of misdemeanor theft was included. The defendant was found guilty of first degree murder, armed robbery and theft. The jury subsequently determined that the defendant was eligible for the death penalty, but declined to impose it. The defendant was then sentenced to a term of natural life imprisonment. The defendant appeals. We affirm in part, reverse in part and remand.

At trial, Gary Adams testified for the State. Adams, employed as a supervisor at Stateville Correctional Center, testified that in the early morning of October 27, 1988, he was en route to the general store at Stateville to pick up supplies. As Adams approached the area of the commissary, he saw the defendant, an inmate he had known for about five years, walking back and forth near the commissary. The defendant pointed or waved at Adams with his right hand as Adams passed him. It appeared to Adams that the defendant was concealing something because he was holding his left hand behind his body where Adams could not see it. As Adams continued toward the general store, he did not see anybody else in the area.

Gerald Oberholtzer, a correctional officer at Stateville, testified that he was in charge of distributing keys to employees who worked the 7 a.m. to 3 p.m. shift on October 27, 1988. On that date at about 6:30 a.m., Oberholtzer gave the keys to the commissary to Suon Troeng, whose assignment that day was to open the commissary.

Robert Shepherd, a correctional sergeant, testified that he supervises inmates in the dining room at Stateville. On October 27, 1988, the defendant was to work in the dining room and was to arrive for work between 5 and 5:30 a.m. According to Shepherd, the defendant did not show up for work at any time on that date. About 7 a.m. that morning, Shepherd became aware of an incident involving Troeng. Shepherd left his assignment and ran toward the commissary. In front of the commissary, Shepherd saw Troeng's

body lying on a grate. Near the body, Shepherd saw an iron bar and some papers strewn about.

Jessie White and her husband, James White, testified that they went to their jobs at Stateville with Troeng Kim on the morning of October 27, 1988. Mrs. White worked in the commissary under Troeng's supervision, and Mr. White worked in the general store. At about 6:40 a.m., the Whites and Mr. Kim were walking through the main tunnel. As they approached the commissary, the Whites saw Troeng's cap on the ground. Next, Mrs. White saw an inmate come down the tunnel and jump over one of the side walls. Mr. and Mrs. White then looked over the wall and saw an inmate "crunched" over in the corner of the grass. When they asked him what he was doing, the inmate, whom Mrs. White identified as the defendant, jumped over the wall and started running. Mr. White pursued the inmate, who was carrying a large plastic garbage bag over his shoulder. He chased the defendant down a grassy area, where he saw two correctional officers coming from the area of the general store. Mr. White yelled to the officers, who then chased the defendant and caught him. Mrs. White ran into the commissary for help, where she noticed that her work area was in disarray, with bags strewn around and two opened Kool cigarette cartons on the floor that had not been left there the night before. When she came back out, Mrs. White found Troeng's body in front of the commissary.

Correctional officers Darryl Coleman, Robert Sutton, and Albert Williams testified about their involvement in the apprehension of the defendant. At about 6:50 a.m. on the date in question, the officers were leaving their assignments at Stateville's G-dorm when they saw Mr. White yelling at them to stop an inmate. The officers saw the defendant running on the grassy side of the tunnel. He was carrying a black garbage bag, and the officers could hear the jingling of keys. Eventually, the defendant dropped the bag and the keys. Coleman stopped to pick up the keys and Sutton caught the defendant behind the air conditioner unit on the side of the law library. Williams picked up the garbage bag the defendant dropped and found some loose cartons of cigarettes inside the bag. The officers identified the defendant as the inmate they caught. When King arrived on the scene, he handcuffed the defendant and took him away. Sutton later found a second set of keys in the grassy area.

On the second day of trial (November 6, 1989), defense counsel orally moved to exclude the testimony of correctional officer Elton Lawler or, in the alternative, for a mistrial on the basis that the

State had violated discovery. Defense counsel noted that he had just received, for the first time that morning, a copy of Lawler's report, which report was dated October 24, 1989. Lawler's report indicated that Lawler searched the defendant following his arrest and found, among other things, some gloves on the defendant. The gloves were examined by the crime lab and found to have blood on them which could match the blood of the victim. Defense counsel further noted that, until he received Lawler's report, he never had any reports that the gloves were taken from the defendant. When defense counsel received a supplemental list of witnesses on October 20, 1989, it contained Lawler's name and the name of Yolanda Galvan, a correctional officer who allegedly received the gloves from Lawler. At that time, defense counsel asked the prosecutor if he had a report from Lawler, but the prosecutor said he had no report from either Lawler or Galvan.

Defense counsel went on to argue that the prosecution's late disclosure of Lawler's report was prejudicial because it was counsel's theory of the case that the State could not link the gloves to the defendant. Counsel pointed out that, when he declared in his opening statement that the evidence would show only that the defendant was guilty of theft, it was with the expectation that the State could not connect the gloves to the defendant.

The prosecutor responded that he first learned on October 22 or October 23, 1989, that Lawler found the gloves on the defendant. (This case was tried by two prosecutors; "prosecutor" will be used throughout this order when referring to one or both of the prosecutors.) He recalled handing Lawler's report to defense counsel on October 25 or 26, 1989. The court asked respective counsel if the blood tests would at best show that the blood on the gloves could have come from the victim, and counsel responded affirmatively. The court then denied the defendant's motion and testimony resumed.

Correctional officer Peter King testified that after he arrived at the scene and handcuffed the defendant, he took the defendant to unit 1, a segregation unit separated from the general prison population. At unit 1, King and Lawler removed the defendant's clothing and searched it. After this strip-search was completed, the defendant was turned over to unit 1 staff.

Elton Lawler testified that he strip-searched the defendant after he and King escorted the defendant to unit 1. According to Lawler, he found two pairs of gloves, which appeared to be stained with blood, in the defendant's back pocket. Lawler also found four

or five "stingers"—heating elements for boiling water for coffee. Lawler testified that Peter King was present at all times during Lawler's search of the defendant. He also testified that he gave the gloves and stingers to Galvan on the date of the incident.

On cross-examination, Lawler testified that he prepared a written report after he turned the evidence over to Galvan. He wrote the report at a desk in the prison hospital on the day of the incident and filed it with Galvan. When Lawler was interviewed in 1989 by Russ Nelson, an investigator for the Department of Corrections, he was told that the Department did not have a report from him. Consequently, on October 24, 1989, Lawler was asked to prepare a report. Basing everything on his memory of the events of October 1988, Lawler dictated the report to Nelson on October 24, 1989, and Nelson wrote it up. In the report, he indicated that he removed a couple of pairs of gloves from the defendant. Also, on cross-examination, Lawler admitted that, while he testified that he removed four or five stingers from the defendant, only two stingers were in evidence at trial.

Richard Williams testified that when he was the correctional sergeant in unit 1 on the date in question, the defendant was brought to the shakedown room, where he was strip-searched by Williams, Captain Nash, and Lieutenant Johnson at about 8:30 a.m. Williams did not believe that the defendant had been previously searched. Among the items taken from the defendant were some State-issued work boots, a gray hooded sweatshirt, and a blue jumpsuit. The jumpsuit had stains on the knee and thigh areas which appeared to be bloodstains.

Yolanda Galvan testified that she worked in the investigation unit at Stateville on October 27, 1988, and was responsible for processing contraband confiscated from searches of inmates. About 7:30 a.m. on that date, Lawler came to the investigation unit with two pairs of gloves and two stingers in their original package. Lawler said he had gotten the items from the defendant. A secretary and correctional officer Sanders were also in the room at the time. Sanders put the items in a brown paper bag, and Lawler was told to go across the hall to make his report. Galvan testified that she never received a report from Lawler. On cross-examination, Galvan testified that she told Investigator Russ Nelson that she received the gloves and the stingers from Lawler, but she could not explain why Nelson did not mention the gloves in his report.

Investigator Russ Nelson testified that he transported certain evidence, including two plastic garbage bags containing cigarettes,

to the State crime lab in Joliet. On cross-examination, Nelson testified that, when he spoke to Galvan sometime within the month prior to trial, Galvan told him that the stingers that were removed from the defendant by Elton Lawler were turned over to her in the office.

Several witnesses gave testimony about what occurred when they responded to the scene of the incident on the morning of October 27, 1988. William Price, a correctional lieutenant, testified that shortly after 6:50 a.m. he found Troeng lying on the ground next to the grate. Price administered "CPR," but he was unable to establish a pulse. Price saw an iron bar and wallet near Troeng's body. When correctional officers William Buffington and Orville Bradford arrived at the commissary about 7:05 or 7:10 a.m., Buffington searched the building, but found no inmates inside. He noticed that an area known as the bagging room was in disarray. Bradford found two black garbage bags; one was inside the commissary and the other outside in the tunnel area. A carton of cigarettes was in the bag he found outside the commissary. Buffington secured the building so that nothing would be disturbed.

Hayden Baldwin of the Illinois State Police testified that he arrived at Stateville about 8 a.m. to process the scene. Baldwin recovered two paper sacks from the floor of the commissary. A partial shoe impression was on the top portion of one of the sacks. Walter Sherk, an expert in footprint comparisons, testified that he compared the footwear impression on the paper sack with the boots recovered from the defendant. Sherk testified that the pattern on the sack was consistent with the right boot, but he could not say that the defendant's boot made the impression. Sherk also testified that the defendant's boots were standard issue at the Department of Corrections.

Susan Rutter, a forensic scientist, testified that she processed two black plastic garbage bags for latent fingerprints. On each bag, she found a print that she identified as belonging to the defendant. She also processed the iron bar found at the scene, but was unable to find any latent prints suitable for comparison.

Judie Welch, an expert in forensic serology, testified that she compared blood samples of Troeng and the defendant to the human bloodstains she found on two of the gloves introduced at trial, one a right-handed and the other a left-handed glove. Welch determined that the blood on the gloves could have originated from Troeng, but did not originate from the defendant. Welch also analyzed the human bloodstains she found on the middle of the iron bar taken from

the scene, and on the right front pocket of the blue jumpsuit taken from the defendant. She determined that the stains could have originated from Troeng, but not the defendant.

At the conclusion of the State's case in chief, the parties stipulated, among other things, that if Peter Seymour was called to testify, he would testify that he was an accountant with the Department of Corrections. As a result of an inventory he conducted at the Stateville commissary on October 31, 1988, and a later inventory which included all cigarettes subsequently taken into custody, it was determined that 242 packs of cigarettes remained unaccounted for following the break-in at the commissary on October 27, 1988. Also, at the conclusion of the State's case in chief, a coroner's report, which indicated that Troeng died from a severe head injury due to blunt-force trauma, was admitted into evidence.

After the prosecution rested, the defendant moved for a directed verdict. The motion was denied.

In his own defense, the defendant testified that he was in the Department of Corrections because he had been convicted of a felony. On the date in question, the defendant arrived at his work assignment, dining room number 1, at about 5 a.m. Nobody was in the dining room, so the defendant left to get some supplies and then returned. When inmates and staff began to arrive for breakfast between 5 and 5:30 a.m., the defendant emptied a trash container and then decided to go to the laundry room to get some bleach. As he approached the laundry room, he saw correctional officer Gary Adams and two inmates in the food wagon, and he waved to them. Shortly thereafter, the defendant decided to follow Adams to the general store and assist him there. When the defendant got to the store, though, Adams and the inmates were already inside. The defendant banged on the door of the store and waited about 10 minutes until he saw a line of inmates on their way back from breakfast. When he saw this, he realized it was close to 7 a.m. and he had to report back to the dining room to be counted. On the way back, he passed the commissary and saw a hat, some keys, some stingers, and two or three large bags on the ground.

Next, the defendant heard someone groaning. He looked over the wall and saw Troeng lying on the ground. He climbed over the wall and lifted Troeng up to a sitting position. Some blood was trickling from Troeng's mouth, but he did not appear to be seriously injured. The defendant did not want to be blamed for the incident, so he climbed back over the wall. The defendant recalled that as he began to leave the area, he picked up two stingers, the keys,

and one of the bags. He looked in the bag and saw that it contained a lot of cigarettes. He then heard someone coming and, under the circumstances, he decided he did not want to be seen so he hid on the other side of the wall. He still had the cigarettes with him, but he never made a conscious decision to steal them. When somebody yelled at him, the defendant ran toward the general store and, as he did so, he dropped the bag of cigarettes and the keys.

The defendant denied striking Troeng with an iron bar on the date in question. He also testified that he did not have any gloves with him that day and that, after he was taken into custody, Lawler searched him but did not find any gloves.

Following the evidence, the conference on jury instructions was held. In addition to instructions on the charged crimes of first degree murder and armed robbery, the court agreed to give a defense-tendered instruction on misdemeanor theft. Following closing arguments and jury deliberations, the jury returned with verdicts of guilty of first degree murder, armed robbery, and theft.

The cause then proceeded to a death penalty hearing. The jury found the defendant eligible for the death penalty but directed the court not to impose it.

The trial court subsequently sentenced the defendant to natural life imprisonment. The court also denied the following: (1) the motion for new trial filed by defense counsel; (2) the defendant's *pro se* post-trial motion which alleged, *inter alia*, that he had been denied effective assistance of counsel; and (3) the defendant's *pro se* motion to disclose all discovery to the defendant. The defendant appeals his conviction, raising four issues for our consideration.

The defendant initially contends that the State's evidence failed to establish his guilt beyond a reasonable doubt because it merely placed him near the scene of the attack some time after it occurred. We disagree.

When presented with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Once a defendant has been found guilty, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) The *Collins* standard should be applied in reviewing the suffi-

ciency of evidence in all criminal cases, whether the evidence is direct or circumstantial. *People v. Pintos* (1989), 133 Ill. 2d 286, 291, 549 N.E.2d 344, 346.

■ Our review of the record reveals that the defendant was the only unescorted inmate present in the area of the crime before and after the crime occurred. The defendant never checked into his proper work station. The shoeprint left inside the commissary was consistent with the size of the defendant's boots. The defendant was found crouched behind a wall near the body, and fled the scene with the commissary keys and the proceeds of the robbery, which he then discarded as he continued to flee. When the defendant was seen by a correctional officer prior to the offense, he appeared to be hiding something behind his back. There was evidence that the fence to a construction site immediately adjacent to the scene of the offense had been tampered with, and contained among the debris at the construction site were bars similar to the one used to inflict the fatal wound. The defendant's jumpsuit contained blood consistent with that of the victim and inconsistent with defendant. The defendant testified in his own behalf, asserting his own version of what transpired. We are of the opinion that the evidence, when viewed in the light most favorable to the prosecution, is sufficient to support the jury's verdict.

The defendant next alleges that he is entitled to a new trial due to an alleged discovery violation by the State. We disagree.

Illinois Supreme Court Rule 412 (134 Ill. 2d R. 412) provides for the disclosure of materials and information within the State's possession. Under Rule 412, the prosecution has the duty to ensure that a flow of information is maintained between various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused. The purpose of the discovery provisions is to afford the accused protection against surprise, unfairness and inadequate preparation. *People v. Boucher* (1978), 62 Ill. App. 3d 436, 379 N.E.2d 339.

■ The record in the instant case reveals that the State complied with Rule 412. On December 2, 1988, the State furnished its original discovery, including a lengthy list of witnesses and notification of reports summarizing oral statements of certain witnesses. Supplemental discovery was filed in April, August, September and October of 1989. Lawler was not listed as a witness in any of this discovery. During trial preparation by the State's Attorney's office in October 1989, as that office sought to reconstruct the chain of custody evidence for the gloves, the State first became aware that

Lawler and Galvan were somehow involved in the chain of custody. The State, on October 20, 1989, immediately disclosed these witnesses to the defense.

During questioning by the State's investigator, Russ Nelson, Lawler revealed that he was the one who had removed the gloves from the defendant. Lawler's original report was apparently misplaced, was never recovered, and was unknown to the prosecutor. Thus, on October 24, 1989, Lawler gave a second report to Investigator Russ Nelson, which report was then signed by Lawler. This second report was filed on October 25, 1989.

The defendant's counsel claimed that he did not receive the report until November 6, 1989, while the prosecutor claimed that he had given the report to defense counsel on October 25 or 26, 1989. The trial court resolved this factual question in favor of the State. Given the fact that the report was filed on October 25, we see no reason to overturn that finding.

Accordingly, we find no discovery violation was committed by the State. The prosecutor was clearly unaware of the missing and never-filed earlier report, and no review of the discovery materials would have disclosed it. This case is one in which the prosecutor was unaware of the existence of a statement prior to trial and where there was no lack of due diligence by the prosecution. (*People v. Kradenych* (1980), 83 Ill. App. 3d 547, 554, 404 N.E.2d 488; *People v. Steidl* (1991), 142 Ill. 2d 204, 568 N.E.2d 837.) The State revealed that Lawler was involved in the chain of custody as soon as it became aware of that fact. When the State learned that Lawler was the individual who removed the gloves from the defendant, it disclosed Lawler's report.

The defendant's third contention is that he was denied his right to a fair trial due to the prosecutorial misconduct during closing arguments. It is well settled that in order to preserve this type of an issue for review the defendant must both contemporaneously object and present that issue in a post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129.) In the instant case the defendant failed to object to all but one aspect of the prosecutor's comments at trial and completely failed to raise it in his post-trial motion. Accordingly, we find this issue to be waived.

The last issue raised by the defendant maintains that his cause must be remanded for a further post-trial hearing. The basis for this claim is that, prior to sentencing, the defendant filed a *pro se* post-trial motion in which he raised the issue of ineffective as-

sistance of appointed counsel. However, at the sentencing hearing the trial court refused to permit the defendant to specify his complaints and present supporting evidence and documentation.

In *People v. Krankel* (1984), 102 Ill. 2d 181, 464 N.E.2d 1045, our supreme court addressed a situation where a defendant raised a *pro se* post-trial challenge to the competence of his attorney's performance at trial. The court held that the cause should be remanded for further inquiry into trial counsel's performance.

In the subsequent case of *People v. Jackson* (1985), 131 Ill. App. 3d 128, 474 N.E.2d 466, the court set forth the procedure to be followed when a defendant, during post-trial proceedings, asserts that his attorney afforded him ineffective representation at trial. The court in *Jackson* adopted an objective approach:

> "The trial court should examine the factual matters underlying the defendant's claim. There are several matters to be determined. If the claim goes to matters of trial tactics or strategy, the defendant's claim should be found spurious and his request for new counsel denied. *** If, however, the factual matters show possible neglect of the defendant's case, the court should appoint new counsel who can undertake an independent evaluation of the defendant's claim and present the matter to the court from a detached, yet adversarial position." 131 Ill. App. 3d at 139, 474 N.E.2d at 474.

The court in *Jackson* went on to indicate that some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is necessary and permissible in assessing what further action, if any, is warranted on a defendant's claim.

In the case at bar, the defendant raised a post-trial challenge to the competence of his counsel at trial. However, during post-trial proceedings, the trial court failed to make even a preliminary inquiry into the defendant's claims. The trial court should have inquired into the defendant's challenge to counsel and examined the factual matters underlying the claim. The court should have afforded the defendant the opportunity, pursuant to the defendant's request, to specify his complaints and to present the evidence and documents he wished to present in support of his motion. The court then could have made the determination whether the defendant was merely questioning counsel's strategy or whether he was showing possible neglect of the case, such that appointment of new counsel was warranted. By failing to inquire and to hear the defendant's

claims, the court did not meet its obligation to address the defendant's challenge to counsel and resolve it.

Accordingly, the defendant's conviction is affirmed. The cause is remanded for a further post-trial hearing on defendant's challenge to counsel's performance pursuant to the guidelines as set forth in *People v. Jackson.*

The circuit court of Will County is affirmed in part, reversed in part and remanded.

Affirmed in part; reversed in part and remanded.

SLATER, J., concurs.

JUSTICE STOUDER, dissenting:

Respectfully, I must dissent.

It is apparent to me the State breached its obligation under Supreme Court Rule 412(a) by failing to disclose, until the second day of trial, the fact that it would present evidence showing that the bloodstained gloves were in fact obtained from the defendant.

The court in *People v. Young* (1978), 59 Ill. App. 3d 254, 375 N.E.2d 442, reversed a conviction due to the State's failure to comply with Supreme Court Rule 412 and disclose an incriminating statement made by the defendant. There, the court held:

> "It is no excuse to say the police did not advise the State of the statement. The police department must fully participate in providing its evidence to the state's attorney in order that discovery can be accomplished. A timely compliance is not when the trial commences or during the trial." 59 Ill. App. 3d at 257.

Similarly, in the instant case, the knowledge of the State's investigators is imputed to the State, such that the prosecutor's argument that he didn't learn about the report until shortly before trial commenced is irrelevant. Benign neglect on the part of the State will not excuse a discovery violation such as this. The information obtained by the State investigators is imputable to the prosecutors and they should not be allowed to introduce such material evidence either just prior to or during the second day of trial. Under these circumstances, the defense should have been afforded the opportunity to investigate the report and attempt to find an avenue of impeachment (if one exists) in order to present the strongest possible defense.

Furthermore, I find the defendant was sufficiently prejudiced by the evidence to warrant a new trial. A new trial should only be granted in cases like this if the discovery violation prejudiced the defendant and the trial court failed to eliminate the prejudice. (*People v. Harris* (1988), 123 Ill. 2d 113, 526 N.E.2d 335.) Among the factors to be considered in determining whether the defendant is entitled to a new trial are the closeness of the evidence, the strength of the undisclosed evidence, the likelihood that prior notice could have helped the defense discredit the evidence, and the willfulness of the State in failing to disclose. *Harris*, 123 Ill. 2d at 152.

In the instant case, the introduction of the report and Lawler's subsequent testimony had a dramatic impact on the outcome of the trial. The basis of the defendant's case was the State could not prove the gloves were either the defendant's or were ever in his possession. By introducing the statement of Lawler at trial linking the defendant to the bloodstained gloves, the State extinguished the defendant's opportunity to investigate the background of the report, to interview the other security guards on duty on the date of the killing, and to investigate any possible flaw in the chain-of-custody employed by the State in regards to the bloodstained gloves.

The failure of the State to provide a defendant with proper discovery material until just before or during trial can easily affect and jeopardize a defendant's trial strategy. (*People v. Elston* (1977), 46 Ill. App. 3d 103, 360 N.E.2d 518.) Without sufficient time for preparation, disadvantages and errors are induced which erode the guarantee of a fair trial. (*People v. Millan* (1977), 47 Ill. App. 3d 296, 361 N.E.2d 823.) In the instant case, the belated disclosure by the State of such material evidence—in a capital case pending for nearly a year—subjected the defendant to surprise, unfairness, and inadequate preparation. Accordingly, I would grant a new trial under these circumstances.

For these reasons, I must dissent.