THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
BRENDA MOSLEY, Defendant-Appellant.
First District (4th Division)    No. 77-1159

Opinion filed February 1, 1979.

James J. Doherty, Public Defender, of Chicago (Robert T. Badesch, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, James S. Veldman, and Suzanne Philbrick, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County the defendant, Brenda Mosley, was found not guilty of attempt murder and guilty of aggravated battery. She was sentenced to a term of five years on felony probation. On appeal the defendant argues (1) she was not found guilty beyond a reasonable doubt after presenting a credible and consistent defense of self-defense and (2) that the trial court abused its discretion in not allowing the defense to question the defendant concerning the victim's use of drugs.

The arresting officers were the first witnesses for the State. Officers Woods and Johnson testified that at approximately 6:45 p.m. on October 21, 1975, they received a radio call directing them to investigate shots fired in an apartment at 8151 South King Drive in the City of Chicago. When they arrived at the apartment building entrance they heard a shot and a child screaming. As the officers entered the building they saw the defendant coming down the stairs. She was wearing a beige jacket which had what appeared to be a small amount of blood on the right side near her face. As the officers tried to stop her she told them to "turn me loose, I want to go. I want to go where my children are." When asked about the gunshots the defendant said she had shot her boyfriend. The defendant told the police that she had a gun in her waistband. Woods removed a .38-caliber revolver with two spent cartridges from her person. The defendant made no attempt to escape and offered no resistance. The police officers' testimony was conflicting as to whether the second gun, found in the apartment, was a .45 or a .357 magnum. That gun was lost and was not produced at trial.

Johnson and Woods went up to the defendant's apartment where they found Charles Hood, the complainant, on the kitchen floor. He was bleeding from the right side of his stomach. Woods testified that when he saw the defendant at the police station he noticed a slight bruise around one of her eyes. Johnson did not notice anything unusual about the defendant's face.

Hood testified that he was employed by the sheriff's department as a correctional officer at the time of the shooting. He has been trained in the skills of martial arts. When on the job he usually carried a .357 magnum Colt revolver, and he also owned a .38 revolver which he generally left at home on the top shelf of the linen closet. Hood testified he had been living with the defendant for three years at the time of the shooting. They lived with the defendant's three children. Hood was the father of the youngest of the children.

After finishing work on the day of the shooting, Hood went to the defendant's apartment where he found the defendant, her children, and

Brenda Allen, a friend of the defendant's. Hood went to the master bedroom to pack his clothes, credit cards and papers. The defendant had packed his clothes the previous day and put them in the trunk of their car. Hood could not find some of his papers, his credit cards, or the .38 revolver. The defendant told him she did not know where they were.

Hood and the defendant then went to her grandmother's house. The defendant's grandmother tried unsuccessfully to persuade Hood to change his mind about moving out of the defendant's apartment. Upon their return to the defendant's apartment, Hood and the defendant continued to quarrel. While Hood searched the bedroom for his belongings the defendant ran out of the apartment and tried to lock the others inside. Hood grabbed her and brought her back into the apartment. He testified that the defendant fell against the banister, which produced some bleeding on her face. Hood asked the defendant either to let him leave or to leave herself. Hood then pushed a large television set in front of the main door to keep the defendant in the apartment.

Hood went to the master bedroom to call the defendant's father. When the defendant discovered what he was doing she pulled the phone cord out of the wall. Hood then tried to use the phone in the living room, but the defendant pulled that cord from the wall too. Hood returned to the master bedroom while the defendant went into the children's bedroom where the two younger children were. Hood heard a shot and ran into the children's room where he saw the defendant with the .38 in her hand. Hood took the baby and put it on the living room couch. Brenda Allen left the apartment with the oldest child after the first shot was fired.

Hood then returned to the children's room where he unsuccessfully tried to talk the defendant into giving him the gun. He next went to the kitchen to call the defendant's aunt, Verta Watkins. The defendant entered the room, pointed the gun at him, and told him to hang up the phone. Hood complied and the defendant went back to the children's room. Hood called Watkins again and told her what was happening. He asked Watkins to come over with the defendant's father to help calm the defendant down. The defendant returned to the kitchen during this phone conversation and shot Hood in the stomach from a distance of ten feet.

The defendant ran out of the kitchen, returned wearing a leather jacket, leaned over the victim and apologized, and then departed. Hood denied hitting the defendant at any time that day. On cross-examination Hood said he had pushed the television in front of the door to prevent the defendant from running out again and from locking him in the apartment.

Brenda Bilbrew testified that she had been a friend of the defendant's for six years but said at trial that she presently strongly disliked her. She

said she had received a phone call from the defendant on the day prior to the shooting. According to the witness, the defendant said she would kill Hood before she would let him go. On cross-examination Bilbrew conceded that she had not told the police or the State's Attorney about the phone call until the day before she testified.

The defendant testified in her own behalf. She said Hood started pushing her around when he first got home from work because he could not find some of his belongings. She also testified that Hood threw a vase at her after the visit to her grandmother's house. When she tried to leave the apartment Hood came down the stairs after her and "popped" her twice in the face with his fist. Hood dragged her back into the apartment and blocked the door with the television set. The defendant said Hood kept coming at her and calling her "bitch." She kept asking him to leave her alone and to stop bothering her. After the defendant shot the gun into the floor in the children's room, Hood pursued her around the apartment and said "bitch, I am going to make you shoot that gun again today." The defendant told him "I wasn't moving no more, I wasn't going to run." She shot him because she was afraid he would hit her again and seriously injure her.

The defendant testified she was going to call an ambulance but then remembered the phones were not working. She went to a neighbor's for help, but no one was home. She then went downstairs for assistance and discovered the policemen there.

The defendant also testified she believed the .357 magnum was in the apartment at the time of the shooting and that because she had not seen Hood remove this gun, to the best of her knowledge he was still carrying it. The defendant denied making a phone call to Bilbrew on the day before the shooting. She also testified that Hood had not tried to telephone anyone that day.

On cross-examination the defendant conceded that she had not seen a gun in Hood's hand that day and that he was not hitting her at the time she shot him.

Allen testified she was in the defendant's apartment on the day of the shooting while the defendant and Hood were having an argument. She testified that the defendant was bleeding from her nose or mouth when Hood dragged her back into the apartment. When Allen saw the defendant with a gun she left the apartment with one of the defendant's children. She did not know whether Hood made any telephone calls that day.

On cross-examination, Allen said she moved the television in order to leave the apartment after the first shot and that the door of the apartment was not locked.

The defendant's father, Reverend Mosley, testified that in June of 1975 he saw his daughter with a swollen lip and mouth and that Hood told him he had hit the defendant.

The defendant's sister also testified to observing Hood and the defendant quarreling at a time prior to the day of the shooting and that she saw the defendant with blood on her mouth at the time.

In rebuttal, the prosecution called Watkins. She testified that Hood had called her on the afternoon of the shooting to say that the defendant had a gun and was shooting it. Watkins also said the defendant had never mentioned that Hood had hit her at any time. Bilbrew also testified in rebuttal and said Reverend Mosley had asked her to testify that Hood beat up the defendant. Mosley denied this.

The defendant argues the prosecution failed to prove beyond a reasonable doubt that she did not act in self-defense. She claims the inconsistent testimony of the prosecution witnesses together with the consistent testimony of the defense witnesses establishes her contention that Hood was shot pursuant to a reasonable belief that such force was necessary to prevent imminent death or great bodily harm to herself.

■■ The defendant raised at trial the affirmative defense of self-defense (Ill. Rev. Stat. 1975, ch. 38, par. 7—1). Once this defense is raised, the State has the burden of proving the defendant's guilt beyond a reasonable doubt as to this issue, together with all of the elements of the aggravated battery charge. (Ill. Rev. Stat. 1975, ch. 38, par. 3—2; *People v. Baker* (1975), 31 Ill. App. 3d 51, 334 N.E.2d 249.) The defendant contends the State has not overcome her affirmative defense with proof beyond a reasonable doubt and that her conviction must therefore be reversed.

■■ Section 7—1 of the Criminal Code permits the use of force against another to the extent the actor "reasonably believes" force is necessary to defend against the other's use of unlawful force. (Ill. Rev. Stat. 1975, ch. 38, par. 7—1.) Force which is likely to cause death or great bodily harm, however, is justified only upon a reasonable belief that it is necessary to prevent imminent death or great bodily harm. (Ill. Rev. Stat. 1975, ch. 38, par. 7—1.) It follows that if the defendant "unreasonably" believed that the shooting of Hood was necessary to prevent her own death or great bodily harm, then her argument of self-defense cannot prevail. .

The reasonableness of the defendant's resort to force is an issue of fact. (*People v. Wood* (1974), 24 Ill. App. 3d 15, 320 N.E.2d 32.) It is the function of the trier of fact to resolve conflicts in the evidence and to determine the credibility of the witnesses. (*People v. Davis* (1975), 33 Ill. App. 3d 105, 337 N.E.2d 256.) And, finally, a reviewing court will not disturb the jury's finding that the defendant's belief was unreasonable unless the evidence is so unreasonable, improbable, or unsatisfactory as to

raise a reasonable doubt of the defendant's guilt. *People v. Diaz* (1976), 38 Ill. App. 3d 447, 348 N.E.2d 199.

■ We find the evidence was sufficient to show and that the jury was justified in determining that although the defendant may have believed her act of shooting the victim was justified, that belief was unreasonable. The jury could have accepted the State's theory of the case which, as presented through the testimony of its witnesses, was reasonable, probable, and satisfactory.

As related by the State's witnesses, the jury could have found that the defendant precipitated the quarreling on the day of the shooting by refusing to give the victim his gun and personal papers; that the victim tried to summon help from the defendant's aunt and father but that his efforts were obstructed by the defendant; that the defendant removed the .38 revolver from its customary location in a closet and proceeded to shoot a hole in the floor; that the victim unsuccessfully tried to talk the defendant into giving him the gun; and finally, that as the victim once again tried to summon help, the defendant discovered him on the telephone, pulled out the gun, and shot him in the stomach. As another court noted, "[a] belief that [the victim], unarmed, might kill or greatly injure the defendant, while she had a loaded gun, was unreasonable." (*People v. Davis* (1975), 33 Ill. App. 3d 105, 110, 337 N.E.2d 256, 260.) "Where the evidence on an issue is conflicting but legally sufficient if the prosecution's witnesses are believed, the question is for the trier of fact." (*People v. Carpenter* (1963), 28 Ill. 2d 116, 122, 190 N.E.2d 738, 742.) The evidence was sufficient to warrant the jury's finding of guilt.

The defendant also argues the trial court abused its discretion in restricting the direct examination of the defendant by not allowing testimony concerning Hood's use of drugs. During direct examination of the defendant, her attorney asked:

"Q. During the period of time that you lived and resided with Charles Hood, Brenda, what if any use to the best of your knowledge, did he make use of any drugs?"

The prosecutor's objection to this question was sustained. At a sidebar conference defense counsel, in an offer of proof, stated that the defendant's sister would testify that Hood "was a steady user of Cocaine and Marijuana" and that "there were indications on the date in question he was reacting in the same fashion that he would have when he used the narcotics." The trial judge rejected the offer of proof and, when trial resumed, the jury was instructed to disregard the above-quoted question. The defendant argues this testimony was material and relevant because drug use can alter perception and possibly explain aggressive behavior.

We do not agree. A defendant is entitled to all reasonable opportunities to present evidence which might tend to create a doubt

concerning her guilt. (*People v. Durr* (1978), 58 Ill. App. 3d 525, 374 N.E.2d 873.) However, in order to be admissible, the evidence offered must be relevant, and "[r]elevancy is established where a fact offered tends to prove a fact in controversy or renders a matter in issue more or less probable." (*Marut v. Costello* (1966), 34 Ill. 2d 125, 128, 214 N.E.2d 768, 769.) The defendant does not appear to argue that the testimony was admissible for impeachment purposes.

■ We believe the defendant's offer of proof concerning the victim's alleged use of drugs was too vague to establish the relevancy of the proposed testimony.

> "The purpose of an offer of proof is to indicate to the trial court, opposing counsel and a court of review the nature and substance of the evidence offered [citation], and where it is not clear what a witness will say, or what his basis will be for saying it, a detailed and specific offer of proof is required." (*People v. Robinson* (1977), 56 Ill. App. 3d 832, 837, 371 N.E.2d 1170, 1174.)

The offer of proof did not indicate that the defendant would be able to present evidence showing that Hood was under the influence of drugs at the time of the shooting. Without such a showing we find the relevancy of the excluded testimony to have been questionable at best. On issues of relevancy, "the trial court has a 'wide scope for decision' and may reject evidence which it determines to be of little probative value because of its remoteness, uncertainty, or conjectural nature." (*People v. Gardner* (1977), 47 Ill. App. 3d 529, 537, 362 N.E.2d 14, 20.) We cannot say the trial court erred in excluding this evidence.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

ROMITI and JOHNSON, JJ., concur.