THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
FRANK RANOLA, Defendant-Appellant.
First District (4th Division)   No. 85—2922

Opinion filed March 5, 1987.

James J. Doherty, Public Defender, of Chicago (Margaret M. Drewko and Gregory W. O'Reilly, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Bonnie Meyer Sloan, and Alison J. Willis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

A jury in the circuit court of Cook County convicted defendant of aggravated battery (Ill. Rev. Stat. 1983, ch. 38, par. 12—4(a)), and he was sentenced to four years' imprisonment. In this appeal from that judgment, defendant contends that his conviction should be reversed because the State did not disprove that he was acting in self-defense when he struck the victim.

The incident giving rise to the charges against defendant occurred on March 13, 1984, in the Gemstone Jewelry Store located in the lower level arcade at 444 West Fullerton in Chicago. On that date the store was owned and operated by the victim, Chanan Mandel, who activated his electronic buzzer and admitted defendant to the store about 2:20 p.m. Although Mandel did not know his name at the time, he recognized defendant as a person who had previously been in the store; Mandel recalled that he had repaired some jewelry for the girl who accompanied defendant on his first visit to the store.

On the afternoon in question, defendant asked to see some jewelry and Mandel showed him several pieces. Defendant then asked about some earrings which were in another case, and after looking them over, expressed an interest in one pair. Mandel leaned over to put the other two pairs back into the case, and as he got up, he felt a blow to his head. When he looked up, he saw defendant about to strike him in the face with a hammer. Mandel attempted to stop defendant, but he was hit above his right eye, and his face and eyes became covered with blood.

Mandel then moved back to the wall and pushed defendant with his body. Both men fell to the floor and in the process knocked one of the cases onto the wall. Then defendant got up and repeatedly struck Mandel on the head with the hammer; Mandel stated that defendant struck him about 10 times in this manner, but that Mandel did not have anything in his hands. At this point Mandel was afraid that defendant was going to kill him, so he told defendant to take the gold and that he would buzz him out. At that, defendant picked up his jacket and walked toward the door, screaming for Mandel to open it. Mandel activated his release mechanism and defendant left.

Mandel, meanwhile, was taken to Grant Hospital, where he received 52 stitches to close the lacerations in his head and also received medication to relieve his pain. He declined admission to the hospital, however, and exercised his option to go home with a friend who promised to watch for any further symptoms which might develop from the beating. Mandel testified that since the incident he has suffered from terrible pains in his head and his eye twitches; he also

reported that his head is sensitive to pressure such as that experienced from running water in the shower.

On the day after the incident, Mandel viewed a lineup at the police station and positively identified defendant as the assailant. On cross-examination he stated that he was visually acquainted with defendant and permitted his entry into the store on that basis, but acknowledged that he had told Detective Gildea that the offender was unknown. He explained that he had seen defendant in the store with a woman a few months before and recognized them together, but when he came in alone on subsequent dates, he was not sure if defendant was the same person. He denied striking defendant, but admitted that he might have scratched defendant's eyes when they were scuffling on the floor, and was unaware that he had inflicted any injuries on him. He also stated that he carries only fine jewelry in his store rather than costume jewelry and that none of his money or merchandise was taken during the incident.

Michael Thomas testified that on the date and time in question he was working in the popcorn shop next door to Gemstone when he heard yelling and noise coming from the jewelry store. When he investigated the disturbance, he saw defendant standing over Mandel, hitting him on the back of the head with a hammer. He then alerted the members of a construction crew who were working nearby and called the police. He and some other men went to the door of the store but could not enter because it was locked, and when Mandel buzzed defendant out, he saw defendant wrap the hammer inside of his jacket, then run up the stairs to Clark Street and west on Fullerton through an alley. Thomas and another man followed him through the alley and across several courtyards to a building located at 629 West Demming. At that point, two police officers arrived on the scene; Thomas advised them of the situation, then accompanied them in a search of the building. Thomas located defendant hiding behind some washing machines in the laundry room and notified the police. Defendant was then apprehended and Thomas identified him as he passed through the vestibule of the building. When he returned to the jewelry shop, Thomas observed that two of the cases had been knocked over and that there was blood on the wall and on the carpet.

Detective Gene Harris testified that he and his partner responded to the scene after receiving radio communications concerning a man with a hammer at 444 West Fullerton and a battery in progress. When they arrived, a man directed them to the alley where the offender had fled and as they proceeded in that direction, they received a third radio communication advising them that the offender was a

white male in his twenties who had curly hair, was covered with blood, and was carrying a gray jacket. They were also advised that this person had been sighted at 629 West Demming. When they arrived at that location, they conversed with Thomas and the manager of the building, then searched the premises. Thomas spotted defendant in the laundry room, and the police officers found him there hiding behind the washing machines. They also recovered a gray jacket from the area which was covered with blood and placed defendant under arrest. As they passed through the vestibule, Thomas spontaneously identified him as the man whom he had been chasing.

Harris then proceeded to the hospital but was unable to speak with the victim, then returned to the jewelry store where he observed that the display cases had been knocked over, that jewelry was strewn about, and that the store was covered with broken glass and blood. He and his partner also combed the alley and areas leading to the premises where defendant was apprehended, but were unable to find a hammer. On the following day, Harris was present when Mandel identified defendant in a lineup, and at trial Harris identified pictures of defendant which were taken after his arrest showing that he had a cracked lip, bruises on his face, and a scratch on his left eye.

Defendant testified that he had been in Mandel's store on prior occasions and a week before had told him that he was looking for a gift for his girlfriend. He did not see anything he liked at that time and Mandel told him to come back in a week. When he returned on the afternoon of March 13, 1984, he asked about the earrings, and Mandel displayed several pairs from the jewelry case located near the front window. After Mandel informed defendant of the price of the earrings, defendant told him that it was too much for the merchandise and asked if he could lower it. Mandel declined, and defendant then told him that he could get a better deal with his sister who sells costume jewelry. At that, Mandel told defendant that he could look elsewhere, and defendant responded that he might go to another place which did not sell "junk like this." Mandel then asked defendant to leave and, in the process, slightly touched defendant's right shoulder with the back of his hand. Defendant responded that he would leave when he was ready and a wrestling match ensued.

During their struggle, a display case was knocked over and the combatants wound up on the floor. At this point, defendant's coat covered his head and Mandel bit him on the cheek and gouged his face. As a result, defendant's lip swelled, and there were teethmarks on his bruised cheek. When this happened, defendant grabbed "something" from the floor of the store and started hitting Mandel on the head;

defendant claimed that he did not know what this object was, but as the struggle continued and Mandel held onto him, defendant continued to hit him with it. When defendant got up from the floor and saw Mandel and the mess in the store, he became scared and wanted to leave. Mandel told him he could take anything he wanted, but he took nothing and asked Mandel to let him out of the store. When the door was released, defendant panicked and fled.

On cross-examination, he stated that when he left the store, he knew that he had inflicted more damage than Mandel, but that he did not seek medical treatment for his injuries. He admitted that on the day after the incident he talked to a detective and an assistant State's Attorney and signed a statement concerning the incident, but did so only under the proviso that he could change it at a later date. In his statement defendant said that he made the first move and that during the skirmish he may have grabbed a hammer; in his testimony, however, he denied initiating the action.

Joann Jaramko Firrek, the supervising nurse at the emergency room at Grant Hospital, recalled from her report that Mandel was treated there for lacerations to his head and was dismissed after deciding to go home with a friend who would watch him. Her report indicated that Mandel stated that he had been hit repeatedly on the head with a hammer by "unknown assailants," but elsewhere in the report reference was made to a single offender.

Detective James Gildea was also called by the defense and testified that he was assigned to investigate the case at hand. During the course of that investigation, he spoke with Mandel, who told him that he was acquainted with his assailant in a business sense, but that he did not enumerate the number of times he had been in the store; he also told him that he had been struck from behind rather than from the front. Gildea further testified that he was present when defendant spoke with the assistant State's Attorney and signed a statement, but that no one had mentioned the possibility of his changing the statement later.

At the close of evidence and the arguments of counsel, the jury deliberated the merits of the case and returned a verdict of guilty of aggravated battery. Defendant was then sentenced to a term of imprisonment and now appeals from that judgment contending that the State did not disprove that his use of force was necessary to save himself from great bodily harm and that, as a consequence, his conviction should be reversed.

■ Under the Illinois codification of the theory of self-defense, a person is justified in the use of force against another when, and to

the extent, that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force; however, deadly force or that likely to cause great bodily harm is permitted only if a defendant reasonably believes that such force is necessary to prevent imminent death or great bodily harm. (Ill. Rev. Stat. 1983, ch. 38, par. 7–1; *People v. White* (1980), 90 Ill. App. 3d 1067, 414 N.E.2d 196.) Once the issue is raised, the State has the burden of proving defendant's guilt beyond a reasonable doubt as to that issue, as well as all the other elements of the offense. (*People v. Woods* (1980), 81 Ill. 2d 537, 410 N.E.2d 866.) Whether defendant's use of force was justified under the law of self-defense depends upon the surrounding facts and circumstances and is a matter to be determined by the trier of fact. (81 Ill. 2d 537, 410 N.E.2d 866.) The jury's verdict will not be disturbed on review unless the evidence is so unsatisfactory as to raise a reasonable doubt of guilt. *People v. Chatman* (1981), 102 Ill. App. 3d 692, 430 N.E.2d 257.

In the instant case, defendant and Mandel gave conflicting versions as to how the altercation began. Mandel testified that, for no apparent reason, defendant struck him on top of the head with a hammer and he responded by pushing him back. A struggle ensued during which they bumped into the showcases and fell onto the floor, where defendant repeatedly struck him on the head with a hammer. The record also shows that this beating was observed and reported by Thomas. Mandel further testified that he was afraid defendant was going to kill him and offered him anything in the store; he also told him that he would release the electronic lock on the door to let him out. When he did, defendant fled. Mandel further stated that he had nothing in his hands during the incident, that he did not strike defendant but may have scratched his eyes when they were on the floor, and that he was unaware of any injury which he may have inflicted upon defendant.

Defendant, on the other hand, testified that the two had a dispute over the price Mandel was asking for the pair of earrings defendant was interested in purchasing and was insulted when he told Mandel that he could get a better deal with his sister's costume jewelry. At that, Mandel told him to leave the store and flicked his shoulder with the back of his hand. Defendant responded by saying he would leave when he was ready.

Although defendant was not sure how the fracas began, he stated that when Mandel pushed him he responded in kind and that the two fell onto a display case and knocked it over, then wound up on the floor, where his coat covered his head. At this point, Mandel started

biting him on his face and gouged his eye, and defendant reached out and grabbed something from the floor and hit Mandel on the head with it. As the struggle continued, Mandel held onto defendant, and defendant continued to hit Mandel on the head with this object. When defendant got up from the floor and saw Mandel and the mess in the store, he panicked and fled without taking any merchandise or money.

Defendant acknowledged that he was the only one who had anything in his hands during the struggle and that he had hit Mandel over the head numerous times with this object. He knew when he left that he had inflicted great damage on Mandel and, after his apprehension, told police that he believed that he made the first move in the fight, although he denied doing so at trial.

■ The reasonableness of a defendant's resort to force under the circumstances, and whether the force used was commensurate with the force encountered, were matters to be determined by the trier of fact. (*People v. Owens* (1977), 45 Ill. App. 3d 1012, 360 N.E.2d 481.) On these issues the jury was faced with a clear-cut question of credibility, and by its verdict, obviously decided these matters adversely to defendant. For the reasons which follow, we find no reason to upset that determination.

Although the protagonists gave conflicting accounts as to how the skirmish began and the blows exchanged, they both reported that defendant was the only one who had a bludgeon, which he used to beat Mandel on the head and caused severe injuries to him. Defendant maintains, however, that Mandel's testimony is incredible and unworthy of belief and should have been disregarded by the trier of fact; and in support of that conclusion, defendant calls our attention to numerous inconsistencies in Mandel's testimony.

■ It is well settled that discrepancies in testimony, such as those cited by defendant, do not necessarily destroy the credibility of a witness, but go only to the weight to be afforded his testimony. (*People v. Montgomery* (1977), 51 Ill. App. 3d 324, 366 N.E.2d 623.) Moreover, where the evidence on an issue is conflicting, but legally sufficient if the prosecution's witnesses are believed, the question is for the trier of fact, who also determines the credibility of the witnesses, the weight to be given their testimony, and also resolves the conflicts in the evidence. (*People v. Mosley* (1979), 68 Ill. App. 3d 721, 386 N.E.2d 545.) In making its determination, the jury is not required to accept defendant's version of events (*People v. Ross* (1981), 100 Ill. App. 3d 1033, 427 N.E.2d 955), but rather must consider the probability or improbabilities of his testimony, the circumstances surrounding the incident, and the testimony of the other witnesses (*People v. Zolidis*

(1983), 115 Ill. App. 3d 669, 450 N.E.2d 1290). Our review indicates that on the evidence presented, the jury could reasonably have believed that defendant's acts were not required to prevent imminent death or great bodily harm to him and thus properly found him guilty of aggravated battery.

Even assuming for purposes of argument that defendant's account of a verbal dispute between the parties over the price of earrings which precipitated into a shoving match and struggle on the floor is true, we find nothing in the record to support defendant's claim that the force he used was reasonable under the circumstances. The record shows that both men were in a similar age group and that defendant was the only one who was armed. Although we recognize that the use of a weapon may be a justifiable response to a physical attack (*People v. Wickenhauser* (1979), 75 Ill. App. 3d 145, 393 N.E.2d 1185), we do not believe that the injuries sustained by defendant, or the level of fighting reported by either party, was such as to justify the indiscriminate beating which defendant inflicted on Mandel. (See *People v. Thompson* (1977), 55 Ill. App. 3d 561, 371 N.E.2d 267.) Threats or words do not justify the use of force (see *People v. Chatam* (1981), 102 Ill. App. 3d 692, 430 N.E.2d 257), and as the supreme court observed in *People v. Woods*, "The self-defense concept is to protect person, not pride" (81 Ill. 2d 537, 543, 410 N.E.2d 866).

In our opinion, whatever justification defendant may have initially had in defending himself, he lost it in the escalation that followed in the absence of any reasonable apprehension of a threat of force that would result in his death or great bodily harm. See *People v. Zolidis* (1983), 115 Ill. App. 3d 669, 450 N.E.2d 1290.

Judgment affirmed.

McMORROW, P.J., and JOHNSON, J., concur.