2020 IL App (1st) 171621-U

No. 1-17-1621

Order filed November 19, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 17431 |
| | ) | |
| MARVIN LEE, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Hall concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The State met its burden to prove the elements of first degree murder and disprove the defendant's affirmative defenses of self-defense and defense of dwelling. Moreover, the trial court did not err by precluding speculative and hearsay testimony from defendant.

¶ 2     After a bench trial, defendant Marvin Lee was found guilty of the second degree murder of

Courtney Caldwell and sentenced to 6 1/2 years' imprisonment.

¶ 3    On appeal, defendant, who asserted that he shot Caldwell in self-defense and defense of his dwelling, argues that the State failed to prove beyond a reasonable doubt that defendant acted without justification where Caldwell snuck into defendant's building, pounded on or kicked defendant's apartment door, screamed obscenities and threatened to harm defendant, charged at defendant after defendant armed himself, and had a history of threatening defendant. Defendant also argues that the trial court erroneously excluded evidence of prior threats Caldwell made against defendant.

¶ 4    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5                                    I. BACKGROUND

¶ 6    Just before noon on September 26, 2015, defendant shot and killed Caldwell, with whom defendant had an intimate romantic relationship. Caldwell was unarmed, and defendant fired multiple gunshots at him from a close range while they were outside defendant's apartment door and in the hallway of his building. Defendant was indicted on six counts of first degree murder and asserted the affirmative defenses of self-defense and defense of domicile. After a bench trial, the court found defendant guilty of second degree murder and sentenced him to 6 1/2 years' imprisonment.

¶ 7    At the bench trial, the State presented evidence that established defendant and Caldwell previously had been involved in an intimate romantic relationship. After their relationship ended, they continued to communicate for a while, but defendant pursued a romantic relationship with Reginald Williams. In 2015, defendant and Williams were living together at defendant's apartment

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

on 47th Street in Chicago. The building had three residential floors over a parking garage, carpeted hallways, and solid wood apartment doors with peep holes. Residents could enter the building through either the main entrance or the garage, but visitors had to go to the main entrance and be "buzzed in" by residents.

¶ 8     On June 16, 2015, defendant sent Caldwell a video of a loaded firearm, accompanied by a text that stated, "locked and loaded. I'm done talking. I offered you a fair fight last night. I came and waited. I don't live like this. You will not take me down." Defendant also sent Caldwell another text that stated, "do not keep waking up f*cking with me, not today or any other. Do not contact me again."

¶ 9     In September 2015, defendant and Caldwell had resumed communicating again via text messages. Furthermore, on September 25, 2015, defendant and Caldwell spent the evening together. After defendant returned home, they continued to communicate via text during the morning hours of September 26, 2015. Around noon on September 26, 2015, Caldwell went to defendant's apartment complex and gained access to defendant's building by entering the garage when another vehicle exited. Caldwell stood in the hallway outside defendant's apartment and a confrontation occurred.

¶ 10     Marquis May, defendant's neighbor, was inside his apartment at the time, watching television. May lived in apartment number 312, down the hall from defendant, who lived in apartment 314. May heard a loud male voice say, "I'm going to tell everyone about your b*tch a**." May then heard a noise, which sounded like someone kicking a door, coming from the hallway outside his apartment. As May walked toward his apartment door, he heard three gunshots. Specifically, he described the kicking noise and three subsequent gunshots as a "boom" followed

about one minute later by a "pow-pow-pow." He believed the sounds were gunshots based on his prior military training and experience. After the shots, he heard someone in the hallway say, "Oh, oh, you shot me." May walked out of his apartment and into the hallway. He noticed shell casings on the floor near apartment 313, which was between May's and defendant's apartments. Defendant's door was closed. May walked further down the hall and found Caldwell lying by the elevator. While May stayed with Caldwell, defendant came into the hallway and said that he was on the phone with the police and the injured man tried to break into defendant's apartment. May heard defendant tell the other person on the phone, "I shot him" and "he tried to break into my apartment." May testified that defendant was calm. May noticed a lot of blood and what appeared to be gunshot wounds to Caldwell's chest.

¶ 11    Autopsy evidence established that Caldwell sustained multiple wounds from four gunshots. The Cook County medical examiner testified that one of the wounds was a perforating gunshot wound that Caldwell sustained to the back of his left thigh; the gunshot entered the back and exited the front of his left thigh. The medical examiner found no gunpowder, stippling, soot or muzzle imprinting near the wound to indicate close range firing. Caldwell also sustained a penetrating gunshot wound to his left leg; the gunshot entered the front of his left leg and went through his tibia. A projectile was recovered from his knee joint. The medical examiner found no gunpowder, stippling, soot or muzzle imprinting near the wound to indicate close range firing. Caldwell also sustained a penetrating gunshot wound to his back; the gunshot entered the center of his back and traveled through his rib area and internal organs. A projectile fragment was recovered from his right lung, and a medium caliber projectile remainder was recovered from just outside his ribs. The medical examiner found no gunpowder, stippling, soot or muzzle imprinting with this wound. The

medical examiner testified that the large amount of blood that had collected at the area of this wound might have interfered with his ability to observe gunpowder, stippling, soot or muzzle imprinting. Finally, the medical examiner testified that Caldwell sustained a penetrating gunshot wound to his chest; this gunshot entered the right side of his chest in a downward and slightly right to left path, hit his lung, and went through his ribs a second time. A separated jacket and core were recovered from the right side of his chest.

¶ 12    The parties entered into several stipulations at trial. These stipulations included the apartment building's surveillance video footage, which showed Caldwell drive into the garage after another vehicle exited and enter the third floor hallway. The video also showed May and fire department personnel arrive at the hallway scene to aid Caldwell. The parties also stipulated that the police department evidence technician who processed the crime scene recovered four expended shell casings, a Glock Model 26, 9mm from on top of defendant's bed, a magazine from inside the weapon, and another magazine from on top of the bed. The parties further stipulated that a forensic scientist who was qualified as an expert in the field of firearm evidence received the Glock and four recovered shell casings in a sealed condition, examined and compared those items, and opined within a reasonable degree of scientific certainty that the fired cartridge cases were fired from the Glock.

¶ 13    The parties also stipulated that Sergeant Paoletti, who was employed by the Cook County State's Attorney's Office, would be qualified as an expert in the field of mobile device data extraction and examination. The parties stipulated that Paoletti received Caldwell's tablet computer and cellphone for extraction, used hardware and software to extract content from those

devices, and opined to a reasonable degree of scientific certainty that the content and data extracted from those devices were accurate.

¶ 14    The parties further stipulated to, and the State published to the court, 911 telephone calls, defendant's electronically recorded interview with the police, and text messages between defendant and Caldwell. In his recorded interview, defendant stated that he did not see Caldwell with a gun, he pushed Caldwell into the hallway and closed his apartment door at least twice, and he shot Caldwell from a distance of four or five feet. Defendant also told the police that he never dated Caldwell and denied having any relationship with him.

¶ 15    Detective Robert Distasio of the Chicago Police Department testified that he arrived on the scene and observed the shell casings in the hallway to be approximately 9 to 10 feet from defendant's door and closer to apartment 313. Distasio did not observe any damage to defendant's door. Distasio observed a firearm on a bed in defendant's apartment. Distasio recovered a cellphone from Caldwell's body and two Apple iPhones from defendant. Distasio testified that the majority of the blood at the scene was toward the elevator and the blood or blood droplets appeared to be halfway from the pool of blood to the entry of defendant's apartment.

¶ 16    The parties stipulated that the cellphone recovered from Caldwell's body was registered to defendant as a work phone, one of the iPhones was registered to defendant and the other iPhone was registered to Caldwell.

¶ 17    At the close of the State's evidence, the trial court denied defendant's motion for directed finding.

¶ 18    On behalf of the defense, Reginald Williams testified that he and defendant were in an intimate romantic relationship since 2002. Although they separated in late 2014, they reconciled

in May 2015 and resumed their relationship. On September 26, 2015, Williams and defendant were watching television when they heard a loud bang from the front of the apartment. Williams initially thought a heavy object fell in the laundry room but then he heard more banging that sounded like someone kicking a door. Williams went to his bedroom and defendant went to the door. From his bedroom, Williams heard someone yell obscenities and then heard four or five gunshots. Although Williams heard the door slam a number of times, he never heard someone threaten to take defendant's belongings.

¶ 19    Defendant testified that after his separation from Williams in late 2014, he dated Caldwell for about four months. In April of 2015, defendant broke things off with Caldwell and reconciled with Williams in May 2015. Williams then moved into defendant's apartment and lived with him and his two children. Caldwell continued to text defendant in June 2015 despite defendant's requests that he stop. Defendant thought Caldwell wanted a reconciliation even though he knew defendant was in a relationship with Williams. In June 2015, defendant sent Caldwell, via text messaging, a video of defendant's gun accompanied by a message that called Caldwell a stalker and stated that defendant would contact the police. Defendant testified that he sent that video message because he "wanted to be left alone."

¶ 20    Defendant testified that Caldwell continued to text him, so defendant set his cellphone to block any calls or texts from Caldwell. Caldwell continued to text defendant from June through September of 2015. Caldwell also left a note on Williams' car in July 2015 and moved into an apartment a couple of blocks away from the apartment defendant and Williams shared. About one week before the shooting, Caldwell sent defendant a gift to his workplace, and defendant unblocked his phone and resumed text messaging Caldwell. They met at Caldwell's apartment on

the evening of September 25, 2015. Defendant testified that he was trying to get Caldwell to leave him alone, so defendant agreed to talk things over and then went home.

¶ 21    Defendant testified that when Caldwell was "banging" outside defendant's apartment door on September 26, 2015, defendant opened the door, stepped into the hallway, and pulled the door behind him so his dog would not get out. He asked Caldwell, "What's up?" Then Caldwell began an obscenity-filled "rant," threatened defendant, threatened to steal something from him, and pushed defendant back through his door. Defendant pushed Caldwell back until he fell down in the hallway, told him to "get the f*ck out," and closed the door. Caldwell continued to either bang on or kick the door. Defendant opened the door again to try to reason with him, but Caldwell continued to rant and threaten defendant. Caldwell swung at but missed defendant, who ducked but slid out of his flip-flops. Caldwell was able to enter the apartment briefly. Defendant, however, "overpowered" him, put him back in the hallway and closed the door. Caldwell continued hitting the door and shouting.

¶ 22    Defendant went to his bedroom and retrieved his gun. He did not intend to fire the weapon; he merely wanted to show Caldwell that he was serious, breaking into people's homes was not a game, and Caldwell needed to leave. Defendant opened his door and looked into the hallway. At the time, Caldwell was near the elevator but then began to walk toward defendant. Defendant pointed his gun at Caldwell and warned him to leave or else defendant would shoot. Caldwell immediately turned and walked about 8 to 10 feet away from defendant, near the elevator at the end of the hallway. But instead of leaving, Caldwell "snapped around" pointed his finger at defendant, and said, "You a b*tch a*s n*gga. You ain't gonna shoot nobody." Caldwell "got low" and started coming towards defendant. Defendant fired the gun in quick succession and stopped

once he realized he had hit Caldwell. Caldwell took a few steps towards the elevator and collapsed. Defendant went back inside his apartment and called police.

¶ 23    After his arrest, defendant spoke to the police but lied about his relationship with Caldwell and claimed he was merely an acquaintance. Defendant also lied to the police by saying that he had a girlfriend, never had a sexual relationship with Caldwell, and had no contact with Caldwell since the night before the shooting.

¶ 24    The trial court found defendant guilty of second degree murder. The court rejected defendant's self-defense claim, noting that Caldwell was neither armed nor attacking defendant at the time of the shooting. The court found that defendant's use of deadly force was not justified because it was not reasonable to believe that deadly force was necessary. The court also rejected defendant's defense of dwelling claim because Caldwell, at most, was banging on the apartment door and was actually retreating when defendant came out of his apartment armed with his gun. The court found that Caldwell was not committing a felony and did not believe defendant's testimony that Caldwell's entry was riotous, violent or tumultuous. The court found that defendant was not justified in his use of force. The court, however, found that defendant subjectively believed he could use that force, but his belief was objectively unreasonable. The court also stated that this case presented a classic situation: if defendant did not have a gun inside of his apartment then somebody—probably Caldwell—might have suffered a black eye, bloody lip or possibly a broken nose, and that use of non-deadly force possibly would have been justified.

¶ 25    The defense filed a motion for a new trial, arguing that the court should reevaluate its credibility findings. The court denied the motion, noting that its credibility findings were supported by the physical evidence and reiterated, "I do not believe that the force used was, in fact, justified.

I believe that the deadly force that was used was not justified." The court thus entered judgement of guilt for second degree murder and thereafter sentenced defendant to 6 1/2 years' imprisonment.

¶ 26                                    II. ANALYSIS

¶ 27                          A. Sufficiency of the Evidence

¶ 28    Defendant argues that his conviction must be reversed because the State failed to meet its burden to disprove beyond a reasonable doubt his two affirmative defenses—justifiable use force in defense of himself and in defense of his dwelling.

¶ 29    When a defendant challenges the sufficiency of the evidence supporting his conviction, the reviewing court must determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Nesbit*, 398 Ill. App. 3d 200, 208 (2010). The reviewing court asks only whether any sensible person could find, beyond a reasonable doubt, that defendant committed the crime. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). In a bench trial, the circuit court resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from the facts, and the reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *People v. Gray*, 2017 IL 120958, ¶ 35. A reviewing court must not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt. *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). The factual determinations made by the circuit court are entitled to great deference on review (*People v. Little*, 322 Ill. App. 3d 607, 618 (2001)), and the reviewing court must allow all reasonable inferences in the record in favor of the State (*People v. Bush*, 214 Ill. 2d 318, 326 (2005)).

¶ 30    Defendant does not challenge the sufficiency of the evidence to prove beyond a reasonable doubt the charge of first degree murder, *i.e.*, (1) that he performed the acts that caused Caldwell's death, and (2) when defendant did so, he intended to kill or do great bodily harm to Caldwell or knew that his acts would cause Caldwell's death. See 720 ILCS 5/9-1(a)(1), (a)(2) (West 2014). However, because defendant raised two affirmative defenses—justifiable use of force in defense of himself and in defense of his dwelling—the State, in addition to proving beyond a reasonable doubt all of the elements of first degree murder, bears the burden of disproving the affirmative defenses beyond a reasonable doubt. See *People v. Izquierdo-Flores*, 367 Ill. App. 3d 377, 383-84 (2006); *People v. Rogers,* 263 Ill. App. 3d 120, 126-27 (1994).

¶ 31                                          1. Self-defense

¶ 32    First, defendant argues that his conviction must be reversed because the State failed to disprove beyond a reasonable doubt his two theories of self-defense—*i.e.*, the imminent danger of either great bodily harm or the commission of a forcible felony—and thus failed to meet its burden to prove he acted without justification. Defendant also contends the trial court failed to understand and apply the correct law.

¶ 33    The statute addressing self-defense provides:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1 (West 2014).

In this context, "imminent" means "reasonably probable," not merely possible and refers not to a future threat but to one that is "present" or "immediate." *People v. Robinson*, 375 Ill. App. 3d 320, 336-37 (2007). Furthermore, a forcible felony is any of a number of enumerated felonies, including robbery, burglary, residential burglary, or "any other felony which involves the use or threat of physical force or violence against any individual." 720 ILCS 5/2-8 (West 2014).

¶ 34 After the State establishes the elements of first degree murder, the trier of fact next addresses the issue of lawful justification. *People v. Spiller*, 2016 IL App (1st), ¶¶ 28-29. To raise the affirmative defense of self-defense, a defendant must establish some evidence of six factors: (1) force is threatened against a person, (2) the person is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of the force applied, and (6) the person's beliefs were objectively reasonable. *People v. Washington*, 2012 IL 110283, ¶ 35. Once the defendant has met this burden, the burden of proof shifts to the State to prove beyond a reasonable doubt that the defendant did not act in self-defense; the State carries its burden if it negates any one of the elements of self-defense beyond a reasonable doubt. *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995).

¶ 35 Under his first theory of self-defense, defendant argues that he justifiably used deadly force because Caldwell posed an imminent risk of great bodily harm to defendant. Throughout the confrontation, Caldwell was obviously very upset and possibly irate and irrational. He had made threats in the past, had snuck into defendant's building, and was pounding or kicking defendant's door, refusing to leave and shouting an obscenity-laced threat to "f*ck [defendant] up." According to defendant, when he opened his door and stepped into the hallway, Caldwell was near the elevator

but then began to walk toward defendant. Defendant pointed his gun at Caldwell and warned him to leave or else defendant would shoot. Caldwell immediately turned and walked about 8 to 10 feet away from defendant, near the elevator at the end of the hallway. But instead of leaving, Caldwell "snapped around" pointed his finger at defendant, and said, "You a b*tch a*s n*gga. You ain't gonna shoot nobody." Caldwell "got low" and started coming towards defendant, disregarding the gun. Defendant argues that it was reasonable under these facts for him to believe that either he or Williams was in danger of great bodily harm.

¶ 36     Defendant adds that Caldwell did not have to be armed for defendant's use of force to constitute a reasonable act of self-defense. See *People v. Dowdy*, 21 Ill. App. 3d 821, 825 (1974) (a mere assault with fists could justify the use of a deadly weapon); *People v. Reiner*, 251 Ill. App. 3d 1065, 1066 (1993) (a single punch to the face that causes any bleeding or bruising is sufficient to qualify as great bodily harm in cases of aggravated battery); *People v. Doolan*, 2016 IL App (1st) 141780, ¶ 52 (a punch to the head and a kick to the chest during an attempted carjacking were sufficient to prove intent to kill). Defendant also states that he was not required to wait until the harm actually occurred before he could justifiably use force in self-defense—the danger needed only to be imminent. *See People v. Estes*, 127 Ill. App. 3d 642, 652-53 (1984); *People v. White*, 87 Ill. App. 3d 321, 323 (1980) ("the right of self-defense arises before the first blood is drawn"). Furthermore, when attacked, "a non-aggressor is not required to retreat from a place where he has a right to be." *Estes*, 127 Ill. App. 3d at 649.

¶ 37     Defendant asserts that the trial court misunderstood and misapplied the law concerning the justified use of deadly force in self-defense. Specifically, defendant contends the trial court found that defendant was at risk of great bodily harm but then erroneously indicated that defendant was not authorized to use deadly force. Defendant also asserts the trial court erroneously indicated that

defendant had a duty to retreat and failed to go inside his apartment or an interior room, double lock the door, and either ignore the commotion in hallway or summon the police to intervene.

¶ 38    Defendant, however, seriously mischaracterizes the trial court's findings and rulings. When the trial court's remarks are viewed in context, the court never found that defendant was at risk of great bodily harm. Instead, the court remarked that if defendant had not chosen to retrieve his gun from his bedroom, then Caldwell would be alive and probably have suffered at most a black eye, a bloody lip or possibly a broken nose. The court clearly found, based on the physical evidence and unbiased witness testimony, that defendant was not facing a threat of imminent great bodily harm because Caldwell was not actually attacking defendant when defendant shot him. Moreover, the court did not state that defendant was expected to retreat. Our review of the trial court's entire remarks reveals that the trial court understood the law, applied the law correctly, and criticized the lethal use of a firearm under the circumstances of this case. Although the court expressed a wish that defendant had called the police or locked himself in his apartment, the court never placed this as a legal burden on defendant. The court was merely reflecting on the tragic circumstances of this case and how Caldwell's death could have been averted if either he had not been so distraught or defendant so quick to shoot.

¶ 39    Furthermore, the trial court's factual finding that there was no imminent risk of serious bodily harm to defendant was supported by the evidence. Caldwell did not have a weapon, and a fact-finder can rationally find that the defendant did not face an imminent threat when the defendant never saw the victim with a weapon. *People v. Babbington*, 286 Ill. App. 3d 724, 731 (1997) (the defendant did not shoot the victim due to an imminent threat of being pistol whipped by the victim because the victim's firearm was in his pocket, not his hand); *People v. Robinson*,

375 Ill. App. 3d 320, 336-37 (2007) (the jury was "practically compelled" to find that the threat was not imminent because, in part, the defendant never saw a firearm and the victim never showed a firearm). Although defendant testified that Caldwell made verbal threats, verbal threats alone are not sufficient to justify the use of deadly force. See *People v. Chatman*, 102 Ill. App. 3d 692, 699 (1981) (victim grabbing the defendant's collar and threatening to harm him before walking away was insufficient to justify deadly force); *People v. Ranola*, 153 Ill. App. 3d 92, 99 (1987) ("[t]hreats or words do not justify the use of force"). Furthermore, the threats Caldwell yelled in the hallway were not necessarily threats of physical violence; the evidence indicated that Caldwell was upset that defendant had jilted him once more and Caldwell's threats could have referred to embarrassing defendant and exposing his lies and infidelity to defendant's partner.

¶ 40    The trial court did not believe defendant's testimony that Caldwell continuously pounded on or kicked defendant's apartment door. Defendant's neighbor heard only one bang on the door, and neither the door nor its lock sustained any damage. In addition, defendant was 6 feet and 2 inches tall and weighed 230 pounds whereas Caldwell was about 6 feet tall and weighed 170 pounds. Defendant testified that he was able to overpower Caldwell, remove him from the apartment, and close the door on him twice. Furthermore, defendant's acts of opening the apartment door three times to speak to Caldwell in the hallway indicated that defendant did not think he was facing imminent and great bodily harm. Also, the location of the blood stains and recovered fired cartridges, and Caldwell's wounds indicated that at the time of the shooting, Caldwell had already retreated from the apartment door and was by the elevator. The trial court did not believe defendant's testimony that Caldwell charged toward defendant after defendant pointed his gun at Caldwell.

¶ 41    We conclude the State met its burden to disprove beyond a reasonable doubt defendant's self-defense theory that the force he used was justified to prevent imminent and great bodily harm. The record supports the trial court's findings that Caldwell did not pose a threat of imminent and great bodily harm to defendant at the time of the shooting and defendant's belief that his use of deadly force was necessary was not objectively reasonable.

¶ 42    Under his second theory of self-defense, defendant argues that he justifiably used deadly force to prevent Caldwell from committing a forcible felony. Defendant contends that Caldwell had snuck into the secured apartment building, repeatedly kicked or pounded on defendant's door, grappled with defendant, pushed his way across the threshold of defendant's apartment, shouted a variety of expletives and the threat "I'm going to f*ck you up, b*tch," and charged towards defendant when defendant raised his gun against Caldwell. According to defendant, under these circumstances, it was reasonable to believe that Caldwell either already committed or was about to commit a number of different forcible felonies, including burglary, residential burglary, home invasion, or aggravated battery.

¶ 43    For many of the same reasons discussed above, we find that the State met its burden to negate defendant's claim that his use of deadly force was justified to prevent Caldwell from committing a forcible felony. The evidence supports the trial court's finding that defendant's belief that Caldwell would commit a forcible felony was not reasonable. The court rejected any claim that Caldwell intended to enter defendant's apartment to commit a felony therein, finding instead that Caldwell was ranting in defendant's hallway because Caldwell was upset that defendant jilted him yet again, this time after they had just spent an evening together. This court reviews the evidence in the light most favorable to the State, and the trial court did not believe defendant's self-serving testimony. The factfinder is "not obligated to accept a defendant's claim of self-

defense; rather, in weighing the evidence, the trier of fact must consider the probability or improbability of the testimony, the circumstances surrounding the killing and the testimony of other witnesses." *People v. Rodriguez*, 336 Ill. App. 3d 1, 15 (2002). The physical evidence showed that the armed defendant had come into the hallway, out of his apartment and away from his door, to shoot the unarmed Caldwell, who was near the elevator when shot. The trial court's finding that Caldwell was not committing or about to commit a forcible felony at the time of the shooting was supported by the evidence.

¶ 44                                  2. Defense of Dwelling

¶ 45     Second, defendant argues that the State failed to meet its burden to disprove beyond a reasonable doubt that he was justified in acting in defense of his dwelling because he reasonably believed that Caldwell, who approached in a riotous or tumultuous manner, was going to assault him or Williams, or commit a felony in his home. Defendant contends the evidence established that Caldwell, who had a history of making verbal threats and following defendant and his family, snuck into defendant's building unannounced and refused to leave despite defendant's repeated requests, and continuously pounded on or kicked defendant's apartment door. Finally, when defendant pointed his gun, Caldwell turned to leave but then came back, obviously not intimidated by the gun and trying to violently approach defendant yet again. Defendant contends that he had to make a quick decision to arm himself and reasonably believed that deadly force was required to terminate Caldwell's felonious invasion of his home. Defendant acknowledges his testimony that he, while unarmed, had been able to overpower Caldwell and removed him from the apartment, but defendant asserts that he had no duty to wait for Caldwell to complete another entry into the apartment before defendant was justified in using force.

¶ 46    Defendant adds that his use of force was also justified under the second prong of the defense of dwelling statute because it was reasonable to believe that Caldwell intended to commit a felony in defendant's home, regardless of how Caldwell entered. Specifically, defendant had reason to believe that Caldwell intended to commit a number of different felonies, like aggravated battery, burglary, felony trespass, home invasion, a hate crime, stalking, or any other felony in his home.

¶ 47    Under the defense of dwelling statute, a person may use deadly force in two circumstances: if the victim enters the home in a violent, riotous or tumultuous manner or if the victim is committing a felony in the dwelling. The statute provides, in pertinent part:

> "(a) A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry or attack upon a dwelling. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if:
>
> (1) The entry is made or attempted in a violent, riotous, or tumultuous manner, and he reasonably believes that such force is necessary to prevent an assault upon, or offer of personal violence to, him or another *then in the dwelling*, or
>
> (2) He reasonably believes that such force is necessary to prevent the commission of a felony *in the dwelling*." 720 ILCS 5/7-2(a) (West 2014).

Defense of dwelling differs from self-defense in that, unlike self-defense, defense of dwelling does not require danger to life or great bodily harm in order to invoke the right to use deadly force. *People v. Sawyer*, 115 Ill. 2d 184, 193 (1986). As in self-defense cases, all the surrounding circumstances are relevant in assessing whether a defendant's beliefs were reasonable. *Id*.

¶ 48    Viewing the evidence in the light most favorable to the State, we conclude that the State met its burden to disprove beyond a reasonable doubt defendant's defense of dwelling claim. First, the evidence established that both defendant and Caldwell were outside defendant's apartment at the time of the shooting. Accordingly, Caldwell was not even entering or attempting to enter defendant's home when defendant shot him, let alone doing so in a violent, riotous, or tumultuous manner. Even if Caldwell had been kicking or pounding on defendant's door earlier, Caldwell was at the elevator when defendant came out of his apartment with his gun and shot the unarmed Caldwell. Further, even if, as defendant testified, Caldwell had tried to push his way into defendant's apartment previously, defendant had "overpowered" him at that time. At the time of the shooting, Caldwell was not even knocking on defendant's door, let alone trying to enter the apartment. Second, the evidence established that defendant did not reasonably believe his use of force was necessary to prevent either violence to himself or another then in the dwelling or the commission of a felony in the dwelling. Again, because defendant was not in his dwelling and Caldwell was not trying to enter it, there was no defense of dwelling.

¶ 49    The trial court reasonably found that (1) Caldwell did not enter or attempt to enter defendant's dwelling in a violent, riotous or tumultuous manner; (2) defendant did not reasonably believe that the force he used was necessary to prevent an assault upon, or offer of personal violence to, himself or another then in the dwelling; and (3) defendant did not reasonably believe

that the force he used was necessary to prevent the commission of a felony in the dwelling. As discussed above, the evidence supports the trial court's findings because there was no damage to defendant's apartment door, his neighbor May—the sole unbiased witness—heard only one loud bang and then a minute passed before he heard the gunshots, and the building's video showed that Caldwell was unarmed and pacing and yelling in the hallway outside defendant's apartment. Defendant's testimony was the only evidence that Caldwell had any physical contact with defendant or made or attempted a riotous, violent or tumultuous entry, and the trial court found that defendant's testimony was not credible. The court also found that defendant's testimony about Caldwell's intention to take defendant's property was not credible; the only reason Caldwell went to defendant's building was to confront him after defendant jilted Caldwell a second time.

¶ 50     The physical evidence supports the trial court's credibility findings—Caldwell was by the elevator when defendant came out of his apartment armed, the shell casings from defendant's gun were found outside another apartment not defendant's, and Caldwell's blood and body were not outside defendant's door. The evidence that defendant shot Caldwell once in his back and once in the back of his thigh indicated that Caldwell had turned away from defendant to flee the situation. Contrary to defendant's account that Caldwell was crouched down low and coming towards defendant as he fired his gun, there was no evidence of any close range firing. Defendant admitted that he shot Caldwell after Caldwell had walked to the elevator.

¶ 51     We conclude that the evidence was sufficient to support defendant's conviction.

¶ 52                              B. Preclusion of Evidence

¶ 53     Defendant argues that he was denied his right to present a defense because the trial court sustained the State's objections when defendant attempted to testify about Caldwell's surveillance

of defendant's home and his partner and the content of Caldwell's prior threatening statements to defendant. Defendant argues that the trial court's rulings prevented him from presenting relevant and material evidence to show defendant's state of mind at the time of the shooting and that his fear of Caldwell was reasonable.

¶ 54    First, defendant challenges the trial court's ruling that sustained the State's objection after defendant was allowed to testify that Caldwell initially seemed to handle their April breakup well but then "things changed" and defendant wanted Caldwell to leave him alone and was willing to get an order of protection because Caldwell was stalking defendant's home. When defendant stated that Caldwell was watching defendant's partner Williams "coming and going" from their apartment, the court sustained the State's objection, and the defense made no offer of proof regarding what further testimony there was to present.

¶ 55    Second, defendant challenges the trial court's ruling that sustained the State's hearsay objection. Defendant testified that he sent Caldwell the June text message with the video of defendant loading his gun. When defendant stated that he sent the video "in response to some verbal threats that were made on a phone call about [Caldwell] catching me outside walking—," the trial court sustained the State's hearsay objection, and the defense made no offer of proof about the nature of those prior verbal threats. Thereafter defendant testified that he sent the video because he "wanted to tell [Caldwell] to leave me alone and to not approach me while walking my dog. That I would come and meet you, but I want to peacefully walk my dog out in public without looking over my shoulder." Defendant added that he was afraid "of something [Caldwell] was going to do" to him and that Caldwell made threats.

¶ 56    Defendant argues that the trial court could not fully and fairly evaluate the reasonableness of his fear on the date of the shooting without knowing about Caldwell's surveillance of Williams and the content of Caldwell's prior aggressive and violent statements to defendant. Defendant acknowledges that he forfeited review of these claims by failing to make an offer of proof and including the claims in his posttrial motion. He asks this court to review these claims under the plain error doctrine based on the closeness of the evidence and seriousness of the error. In the alternative, he argues that counsel was ineffective for failing to preserve these claims for review by making an offer of proof and including the claims in a posttrial motion.

¶ 57    The plain error doctrine is a narrow and limited exception to the general waiver rule allowing a reviewing court to consider a forfeited issue that affects substantial rights. *People v. Herron*, 215 Ill. 2d 167, 177-79 (2005). Under the plain error doctrine, we may consider a forfeited error when either "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *Id*. at 186-87. Defendant has the burden of persuasion, and the court's first step in conducting a plain error analysis is to determine whether error occurred. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). For the reasons that follow, we find that no error occurred.

¶ 58    The admission of evidence is within the sound discretion of the trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010); see *People v. Fredericks*, 2014 IL App (1st) 122122, ¶ 39 (an abuse of discretion occurs only when the trial court's ruling is arbitrary, fanciful, or unreasonable). An adequate offer of proof in the trial court is the key to saving for review an error in the exclusion of evidence; the purpose of an offer of proof is to disclose to the trial judge and opposing counsel

the nature of the offered evidence and to enable a reviewing court to determine whether exclusion of the evidence was proper. *People v. Jackson*, 180 Ill. App. 3d 78, 91 (1989). In making the offer of proof, counsel must explicitly state what the excluded testimony would reveal and not merely allude to what might be divulged by the testimony. *People v. Andrews*, 146 Ill. 2d 413, 421 (1992).

¶ 59    Defendant's claims of error fail. The record establishes that he was able to testify that Caldwell was a stalker, Caldwell had made threats, and defendant was afraid of "something [Caldwell] was going to do" to him. Furthermore, defendant testified at trial about the obscenity-laced threats Caldwell yelled in the hallway, and transcripts of the texts exchanged between defendant and Caldwell over the course of several months—which indicated that Caldwell was obsessed with defendant, obviously upset, and possibly irate and irrational—were admitted into evidence. Moreover, the trial court considered this evidence when it ruled that the crime of first degree murder was mitigated down to second degree murder because defendant actually and subjectively believed that a danger existed that required the use of force he applied.

¶ 60    Although Williams testified that he previously received a note Caldwell had put on Williams' car, Williams did not testify that Caldwell was watching his "comings and goings" to and from the apartment. Furthermore, defendant's assertions that Caldwell's prior threats were serious and defendant was afraid of him were contradicted by defendant's behavior at the time in question. Specifically, defendant spent the evening before the shooting with Caldwell, went to Caldwell's apartment alone and watched a movie and talked with him, and was willing to "relate to him as a person [and] maybe just reaffirm things as a friendship." The court gave defendant wide latitude in discussing his relationship with Caldwell, and the record establishes that defendant was allowed to present a defense and received a fair trial.

¶ 61    Likewise, we find no support for overcoming the presumption "that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). To establish a claim of ineffective assistance of trial counsel, defendant must show that counsel's performance was deficient and defendant suffered prejudice as a result, *i.e.*, there was a reasonable probability that, but for counsel's deficient performance, the trial outcome would have been different. *Id*. at 694. Defendant must satisfy both prongs of the *Strickland* standard. *People v. Taylor*, 2017 IL App (4th) 140060, ¶ 26. Matters of trial strategy, such as decisions concerning what evidence to present, are generally immune from claims of ineffective assistance of counsel. *People v. West*, 187 Ill. 2d 418, 432 (1999).

¶ 62    In the present case, defense counsel's performance was not objectively unreasonable, nor did that performance prejudice defendant. Defense counsel questioned defendant in detail and at length regarding defendant's perceptions about and the nature of his relationship with Caldwell. The text messages between the two were admitted into evidence, and the trial court agreed with defense counsel's argument that Caldwell's unreturned feelings for defendant were at issue. Specifically, the trial court stated that the evidence clearly established that defendant "wanted nothing to do with [Caldwell] in this matter" and Caldwell was obsessed with defendant. Caldwell may have hurled verbal insults at defendant but nothing in the record indicated that Caldwell had a violent character that would have necessitated defense counsel seeking the admission of such character evidence. Ultimately, through defense counsel's efforts, defendant was able to establish a mitigated mental state and was convicted of second degree instead of first degree murder. Under these circumstances, counsel's performance was not ineffective, nor was defendant prejudiced in any manner.

¶ 63    Defendant has failed to meet his burden of showing either error under the plain error doctrine or counsel's deficient performance under defendant's ineffective counsel claim. We conclude that the trial court did not deny defendant his right to present a defense.

¶ 64                                III. CONCLUSION

¶ 65    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 66    Affirmed.